Charles E. **BOINEAU**, Jr., William L.
Turbeville and Dolores R. Ellis,
Petitioners,

v.

O. Frank **THORNTON**, Secretary of State
of the State of South Carolina, et al.,
Respondents.

Civ. A. No. AC–1465.

United States District Court
E. D. South Carolina,
Columbia Division.

Aug. 10, 1964.

Ralph E. Becker, Washington, D. C., Hoover C. Blanton, Columbia, S. C., and Robert E. Goostree, Washington, D. C., for petitioners.

Daniel R. McLeod, Atty. Gen. of South Carolina, Everett N. Brandon, Asst. Atty. Gen. of South Carolina, Clarence T. Goolsby, Jr., Asst. Atty. Gen. of South Carolina, and Frank A. Graham, Jr., Richland County, South Carolina, County Atty., for respondents.

Before HAYNSWORTH, Circuit Judge, and MARTIN and HEMPHILL, District Judges.

HAYNSWORTH, Circuit Judge.

Out of the now established principle that, within reasonable limits, each voter, in every state and its political subdivisions, is entitled to one vote as equal as may be in weight to that of every other voter in the same election, arises a question as to whether a state may constitutionally require a voter to vote for as many people as the number to be elected to, or nominated for, a particular office. The question arises in connection with the impending general election in Richland County, South Carolina, of ten members to serve in the South Carolina House of Representatives, and out of South Carolina's requirement that, in that election, each voter must vote for ten persons, no less and no more. We find the requirement not unconstitutional.

In a primary election, the Democratic Party of Richland County has selected ten nominees for election to the House of Representatives. The Republican Party, in a convention, has selected two nominees for the same office. Because the Republican Party does not have a

full slate of nominees, the plaintiffs complain that Republican votes will be diluted by the requirement that, in order to cast a valid vote for the two Republican nominees, a voter must vote for eight of the Democratic nominees or eight other qualified electors. This .contention is founded upon the Fourteenth Amendment, which has been held to prevent the dilution of votes by arbitrary attribution of greater weight to other votes.

There is another aspect of the complaint, for one of the plaintiffs, a lady, asserts a right under the Nineteenth Amendment to vote only for women candidates and to withhold her vote from all male candidates. She also supports the Fourteenth Amendment contentions of the other plaintiffs, for, if the voter is entitled under the Fourteenth Amendment to vote for fewer candidates than the number to be elected, she assuredly has the right to make her selection upon the basis of their sex.

 Because the plaintiffs seek to enjoin state officials from the performance of their duties upon the ground that the statute under which they will act is in conflict with the Constitution of the United States, a special District Court of three judges was convened pursuant to the provisions of 28 U.S.C.A. §§ 2281 and 2284.

By statute in South Carolina,[1] it is provided that "[i]f a voter marks more or less names than there are persons to be elected or nominated to an office or if for any reason it is impossible to determine the voter's choice for any office to be filled, his ballot shall not be counted for such office * * *." Enforcement of the "or less" requirement of this statute is the object of the plaintiffs' attack.

The statute speaks in terms of a paper ballot to be marked by the voter. That was the customary method of voting in South Carolina in 1950 when the statute was enacted. All polling places in Richland County, South Carolina are now equipped with voting machines, however,

and paper ballots are no longer in use. Agreeably with the purpose of the statute, however, the defendants, unless restrained, will cause the machines to be so set that the machine will not record a vote for any candidate for the House of Representatives unless the voter votes for ten, the number to be elected.

Under the statute, the voting machines will be so set that a Richland County voter wishing to vote a straight Democratic ticket in the election for the House of Representatives can move one lever, so that when the actuating lever is moved his vote is cast one each for the ten Democratic candidates. If he does not wish to do that, he may vote for one or both of the Republican nominees and nine or eight other persons, as the case may be, one or more of whom may be Democratic nominees. If he wishes, he may vote for ten persons, no one of whom has been nominated by either party, and the mechanics of writing in the names of persons other than the nominees of the two parties is not complicated. However, he must vote for ten. The actuating lever will remain locked, and no vote in the election for the House of Representatives can be recorded, until the voter has moved the one lever to vote for the ten Democratic candidates or ten levers to vote for ten persons, official candidates or others.

The plaintiffs would like the right to vote for the two Republican nominees by moving one lever and thus to vote a straight Republican ticket, though in itself incomplete, just as a voter may, if he wishes, vote a straight Democratic ticket, which is in itself complete. They want other voters wishing to vote for the Republican nominees to have the same right, and have produced mathematical data indicating that a requirement that Republican voters vote for Democratic candidates to fill out a slate of ten would result in a dilution of the weight of the votes for the Republican nominees.

It is true, of course, that if every voter wishing to vote for the two Republican nominees were required to vote for eight

1. South Carolina Code 1962, § 23-357.

Democratic nominees, the weight of the Republican votes would be substantially diluted, because Republican voters would be casting votes for Democratic nominees running against the Republicans. Such dilution would be at its maximum if the Republican votes for Democratic candidates were evenly distributed among the ten Democratic candidates. The dilution would be diminished if the voters who vote for the two Republican nominees should not divide their votes for Democratic nominees evenly among the ten Democratic candidates. The two Republican nominees will win if they receive more votes than the lowest two of the Democratic nominees. Thus if every voter who votes for the Republican nominees should vote for the same eight Democratic nominees, the Republican nominees would be elected by a bare majority of the voters. In that unlikely event, no dilution whatever of the weight of Republican votes would have occurred.

The law, however, does not require that any supporter of the Republican nominees vote for Democratic candidates. He may vote for the two Republicans and eight other persons of his choice. If he does so, his vote for the Republicans will not be diluted by any additional credit to any Democrat.

Moreover, the requirement that each voter vote for ten persons for the House of Representatives places the Republican nominees in a position to be the likely beneficiaries of the votes of normally Democratic voters who do not wish to vote for one or more of the Democratic candidates. Indeed, the plaintiffs' assumption of straight party preference is not borne out by history in South Carolina. In the last election for the House of Representatives, the Richland County Republicans offered a complete slate of ten candidates as did the Democrats. The disparity of votes among the twenty candidates shows a substantial amount of cross-voting. Recent history in South Carolina indicates that many voters vote for individuals without strict regard for party labels.

To avoid dilution of Republican votes, the device of write-ins for persons other than official nominees of either party is not wholly impractical. South Carolina voters are not unaccustomed to write-in voting. In the general election of 1954, the Honorable Strom Thurmond won election to the United States Senate as a write-in candidate.

Nevertheless, the South Carolina statute in its present form does impose some burden upon the present two Republican nominees and their supporters. It is a difficulty that could have been avoided if the Republican Party had nominated a full slate of candidates. Dilution of Republican votes can still be avoided by the use of the write-in device. The use of that device, however, places some additional burden upon the Republican voter, for it is not as easy to vote that way as for the straight Democratic ticket which can be accomplished by moving one lever. It is also probably true, as the plaintiffs contend, that the write-in device for avoidance of dilution of Republican votes could be made generally effective only if the Republican Party and its nominees conduct a pre-election campaign to inform Republican voters about the means of voting without dilution of their vote for the two Republican candidates. In practice, therefore, enforcement of the statute may result in some dilution in the weight of the Republican votes as compared with the votes of straight ticket Democrats. Such dilution can be avoided or minimized, but only at the cost of some detriment to the Republican candidates and their supporters.

Given the fact that the Republican Party chose to nominate an incomplete slate of candidates for the House of Representatives, however, a finding that the statute imposes some detriment upon the two nominees and their supporters is only the beginning of our inquiry. We must look to the statute and the apparent legislative purpose to determine whether its enforcement is so arbitrary as to amount to a denial of equal protection of the law within the meaning of the

Fourteenth Amendment. Before doing so, however, we should note the emergent principles from the recent voting cases in the United States Supreme Court.

In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, the Supreme Court held that an action based upon the Fourteenth Amendment challenging gross malapportionment in a state legislature presented a justiciable issue. In Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, the Supreme Court struck down Georgia's county unit system, and in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481, the principle was enunciated that congressional districting must be done on a basis of substantial equality of population. Finally, late in the last term of the Supreme Court, a number of decisions came down involving apportionment and districting problems, of which Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 is the most pertinent here. In Reynolds v. Sims, it was decided that both Houses of Alabama's Legislature must be apportioned on the basis of substantial equality of population, and that geographic and other considerations were not constitutionally permissible standards.

In all of these cases, the dilution of voting power, which moved the Supreme Court to act, was both inherent in the situation and unavoidable. The voters in the under-represented districts or counties were powerless to increase their representation or to decrease that of overly represented districts or counties. Political remedies were obviously inadequate in such cases as Baker v. Carr and Reynolds v. Sims, for there had been no reapportionment of the two state legislatures involved in those cases for more than sixty years despite radical changes in population patterns.

These cases have now established the principle that districting must be substantially on a population basis in order to avoid disparities in the weight of votes in different voting districts. The opinions in Reynolds v. Sims make it plain, however, that while historical, economic and geographical considerations cannot be employed to justify disparity, "[m]athematical exactness or precision is hardly a workable constitutional requirement." So long as the state apportions the houses of its legislature and draws the lines of its voting districts with full regard for the principle of equality of population, some divergence from the strict population basis is authorized, provided it is based upon practical and legitimate considerations which are more than excuses for disparity.

The teaching of these cases then, as we read them, is that population is the only permissible standard for districting, but state districting will not be struck down because of minor departures from the principle or mathematical imprecision. What is prohibited is an arbitrary departure from the population standard required by the Constitution.

It is just such arbitrary disparity under state law which is proscribed by the Equal Protection Clause of the Fourteenth Amendment. That clause prohibits invidious discrimination; it does not invalidate a state statute based upon reasonable classifications which operates alike upon all persons similarly circumstanced.[2]

Transposing these principles, we think it apparent that the plaintiffs as voters are entitled to have their votes counted without arbitrary dilution. Indeed, that was the express holding of such cases as United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717, and United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341. It is only abitrary dilution which has been prohibited, however, and poten-

2. See Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485; Ohio ex rel. Lloyd v. Dollison, 194 U.S. 445, 24 S.Ct. 703, 48 L.Ed. 1062; Walston v. Nevin, 128 U.S. 578, 9 S.Ct. 192, 32 L.Ed. 544.

tiality of dilution which can be completely avoided only at the cost of dilution of the weight of votes of others may be neither arbitrary nor unlawful. Indeed, a statutory scheme cannot be said to be unconstitutional, though it contains the seeds of possible dilution of some votes under extraordinary circumstances if the alternatives open to the legislature embodied more likely dilution of other votes in more frequent circumstances.

We turn then to the statute.

The plaintiffs concede, of course, the legitimacy of the statute's requirement that a vote may not be counted if a voter undertakes to vote for more persons than are to be elected. If there are ten members of the House of Representatives to be elected and a voter undertakes to vote for eleven or twelve, no one can say for whom he would have voted had he voted for only ten. Under no theory is he entitled to vote for more than ten. The plaintiffs, however, see no similarly legitimate objective underlying the requirement that he vote for no less than ten, though it is quite apparent to us it was inserted for the purpose of avoiding dilution of votes and achieving full participation of the electorate in ultimate decisions.

We have in hand a ready illustration in the complaint of the lady who, as a plaintiff in this case, asserts a right to vote only for female candidates. If she and her sisters vote only for female candidates officially on the ballot, while their husbands and brothers, in the voting booth less conscious of their sex, should vote for the number of persons to be elected, the effectiveness of the votes of the men is diluted by the concentration of the votes of the women. The women in voting for females alone do not dilute their votes by increasing the votes for any male opponent, and the men, voting a full slate and casting some of their votes for female candidates, are thus placed at a disadvantage with respect to the weight of their votes.

If there should be declared a constitutional right of the voter to vote for fewer than the number to be elected, as all of the plaintiffs contend, it would be a boon to minorities. By concentrating their votes upon one candidate, or two, they would avoid the dilution of the weight of those votes by votes for others running in competition with the favored candidate or candidates. Such a voting tactic, if permissible, would likely evoke counteraction, with a resulting deprivation to the state of full participation of the electorate in ulimate decisions.

An extreme example has been suggested. If five men are candidates for nomination to a four-member commission, uniform voting of each partisan for the one candidate of his choice could result in the nomination of four men, no one of whom had a majority, and of one or more by a very small proportion of the electorate. If A, B and C had many friends, each of whom voted for the one man he most favored, while D and E had few, but each of those few voted alone for the man he wanted, A, B and C would receive substantially more votes than either D and E, but neither one might receive a majority. D might, indeed, receive only a handful of votes, but a few more than E. D would be nominated, but a susbtantial proportion of the electorate would not have participated in the choice of D over E.

It was to avoid this sort of consequence that the Legislature included the requirement that each voter, in order to have his vote counted, must vote for a number of persons equal to the number to be nominated or elected. Applied to primaries, and this statute does apply to primaries as well as to general elections, it serves a legitimate and practical purpose. The requirement avoids rather than fosters possibilities of dilution of the weight of votes. It works similarly when applied to general elections so long as each of the opposing parties offers a complete slate of candidates, that is a complete slate for each office it wishes to contest. Thus, under the statutory scheme, there would be no possibility of any one's vote being diluted in compari-

son with that of any other voter [3] if the Republicans, themselves, had offered a complete slate of candidates for the House of Representatives, or had offered none. The possibility of involuntary dilution in the weight of some votes arises only out of the decision of the Republican Party to offer an incomplete slate of candidates for the House of Representatives, a circumstance which was hardly contemplated by the Legislature of 1950 when it enacted the statute. This sort of avoidable difficulty creating a potentiality of dilution of the weight of votes, which even still may be avoided by resort to the write-in privilege, is not such a statutory defect which requires that the statute be declared fatally arbitrary in spite of its apparent legitimate basis.

Even in this situation, the statute may serve some legitimate purpose of the state by assuring a fuller participation of the electorate. A necessary result of the requirement is a greater number of cross votes than otherwise would be had. Under the requirement, the Republican nominees will receive the votes of some Democratic voters, who, for personal or other reasons, do not wish to vote for one or more of the Democratic candidates, while some Republican voters will affirmatively wish to support one or more of the Democratic nominees, or will vote for some of them, because the undertaking to have all Republicans resort to the write-in device will not be completely and entirely effective. If, then, the two Republican nominees receive enough votes for election, the determination of those eight of the ten Democratic nominees, who are to be declared elected, will be on the basis of a fuller participation of the electorate. Indeed, if straight party voting was permissible and was universally followed, as the plaintiffs would have it, there would be no means of deciding which eight of the ten Democratic nominees had been elected if the two Republicans received a majority, for each of the ten Democratic nominees would have received the same number of votes. If the two Republicans are elected, the more cross-voting there is, the greater will be the participation of the electorate in the determination of which eight of the ten Democrats are elected to serve with the two Republicans.

■ Full participation of the electorate in the important process of selection of the individuals who are to represent its members in the House of Representatives is a legitimate objective of the state, and that objective is served by the statutory plan even in this extraordinary situation resulting from the Republican Party's presentation of a partial slate.

Though we recognize that the Republican nominees and their supporters are to some extent disadvantaged by the statute in this particular situation, it is a disadvantage which the Republican Party, itself, might have avoided, and still can largely avoid, by persuading its adherents to use the write-in privilege. By striking down the statutory requirement, however, we would expose other voters to disadvantage. Those disadvantaged under the statutory scheme as a result of their own doing have no constitutional right to relief when relief will impose disadvantage upon other voters who have no effective means of avoiding it. Indeed, the disadvantage suffered here by Republican nominees and their supporters is relatively slight, and balanced against it are the apparent purposes of the statute and its legitimate objectives to avoid other possibilities of dilution of the weight of votes and the promotion of the fullest participation of the electorate in the selection of public officials. In short, we conclude that there is nothing arbitrary in the statutory plan, nor any requirement of the Fourteenth

3. If one cross votes, dividing his votes among candidates of the two parties, he may dilute the weight of his vote in comparison with that of straight ticket voters, as we have seen, but that is his choice. Dilution is not the inevitable result of cross-voting, however. If the cross-voters are relatively numerous, the general election tends to resemble a primary, and the ultimate winners from both slates of candidates may be determined by the choices of the cross-voters.

Amendment which would compel resort to some other alternative.

Our conclusion finds support in the few cases in which a similar problem has been considered. In Alsup v. Mayhall, S.D., Ala., 208 F.Supp. 713, a statutory District Court of three judges approved an Alabama statute requiring each voter in a congressional election at large to vote for eight, the number to be elected.[4] State courts dealing with similar problems have come to the same conclusion. Farrell v. Hicken, 125 Minn. 407, 147 N.W. 815, L.R.A.1915B, 401; Orpen v. Watson, 87 N.J.L. 69, 93 A. 853, aff'd. 88 N.J.L. 379, 96 A. 43; cf. Griffin v. Trapp, 205 Ga. 176, 53 S.E.2d 92, in which Georgia law was construed to permit a voter to vote for less than the number to be elected.

■ Whether or not the Legislature might have made a wiser choice is not a justiciable question. There are those who find desirability in some provision for minority representation, and various schemes for cumulative and proportional voting have their advocates. It was the Legislature's prerogative, however, to weigh the contending considerations and to make an enlightened choice among the several alternatives open to it. As long as the alternative it selected cannot be said to be arbitrarily unfair or discriminatory, it cannot be said to be impermissible under the Fourteenth Amendment.

■ The plaintiffs' additional claim that the statutory scheme conflicts with the Nineteenth Amendment is empty. Under the Nineteenth Amendment, South Carolina may not deny or abridge the right of citizens to vote on account of sex, but this statute contains no abridgement of the right. The statute is sexless. It draws no distinction between men and women voters. Every voter of whatever sex has the same right to vote subject to the same limitations. In exercising that right, of course, any voter who wishes to do so may found his choice upon the sex of individual candidates, but there is nothing in the Nineteenth Amendment which requires a state to afford to women voters opportunity to vote only for female candidates. However, as we have noted, a female voter in Richland County does have the right, if she wishes, to vote only for women, though, in a multiple office race, such as that of the House of Representatives, she is required to vote for ten persons. If there are not so many females among the official candidates, the statute, itself, makes the write-in procedure available to her.[5] By writing in the names of a sufficient number of other women, she can readily avoid dilution of her strictly female vote.

■ We conclude that South Carolina's requirement that, in multiple office races, each voter must vote for as many persons as are to be elected or nominated, is neither generally unconstitutional, as the plaintiffs contend, nor is it so as applied in the particular context of the impending general election in Richland County. The plaintiffs are not entitled to injunctive relief, and the complaint will be dismissed for want of equity.

Dismissed.

4. Alsup v. Mayhall was effectively overruled insofar as it approved the nominating process by Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 1362, 12 L.Ed.2d 506. This was recognized in a subsequent decision of the three judge court. Moore v. Moore, S.D., Ala., 229 F.Supp. 435. Neither Wesberry nor Moore, however, affects the authority of Alsup on the question with which we deal.

5. Provision for write-in voting is expressly contained in § 23-357.