Janie Maynor **LOCKLEAR** et al., Appellants,

North Carolina League of Women Voters, Amicus Curiae,

v.

**NORTH CAROLINA STATE BOARD OF ELECTIONS** et al., Appellees.

No. 74–1856.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1975.

Decided April 23, 1975.

Barry Nakell, Alexandria, Va. (Adam Stein and Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., on brief), for appellants.

Sara E. Green, Nashville, Tenn. and Trudy B. Levy, Washington, D.C., on brief, for amicus curiae North Carolina League of Women Voters.

W. Earl Britt, Fairmont, N. C., and James Wallace, Jr., Associate Atty., N. C. Dept. of Justice (Robert Morgan, Atty. Gen. of N. C. on brief), for appellees.

Before WINTER, CRAVEN and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

Plaintiffs, eligible voters of Robeson County who reside within the geographi-

cal jurisdiction of the Robeson County Board of Education, present a constitutional challenge to the way in which members are elected to the six school boards in Robeson County, North Carolina. They assert that the North Carolina statute, c. 770 [1969] N.C. Session Laws, *as amended*, c. 207 [1973] N.C. Session Laws, which permits residents of city school boards to vote for the election of some county board members, unconstitutionally dilutes their votes for members of the county board.[1] The district court, on motion for summary judgment, upheld the validity of the statute because it concluded that a compelling state interest justified participation of city board residents in the election of certain county board members. We disagree. We reverse the district court and remand the case for the entry of a declaratory judgment and the fashioning of other appropriate relief.

## I.

Of the six boards of education in Robeson County, five are termed city ad-

ministrative units and the sixth is denominated the Robeson County Board of Education.[2] Despite this nomenclature, each school board is an independent body corporate with an exclusive geographical jurisdiction within which each board has full responsibility for operation of its own schools. N.C.Gen.Stat. §§ 115–4, 115–27, 115–35, 115–68, 115–86 (1966), 115–180 (1973 Supp.), 115–181, 115–188 (1966).[3] All six boards have precisely parallel powers and responsibilities within their respective geographical jurisdictions.

The boards are, nonetheless, elected quite differently. Members of city boards are elected exclusively by the voters residing within each city jurisdiction. Of the eleven members of the county board, seven are elected by all of the voters residing in the six jurisdictions, both county and five cities, and four are elected exclusively by the voters residing in the county jurisdiction, excluding residents of the five cities.[4] Thus, while city voters may vote for members of

---

1. Plaintiffs further assert that racial discrimination also results from the dilution of their votes which they alleged. Our decision on the issue of voting dilution makes it unnecessary for us to reach the claim of racial discrimination.

2. The city boards serve the jurisdictions of Fairmont, Lumberton, Maxton, Red Springs, and St. Paul.

3. Of the statutes cited, two are quite specific. N.C.Gen.Stat. § 115–68 provides:

   All the powers, duties and responsibilities imposed by law upon the superintendents of county administrative units shall, with respect to city administrative units, be imposed upon, and exercised by, the superintendents of city administrative units, in the same manner and to the same extent, insofar as applicable thereto, as such powers and duties are exercised and performed by superintendents of county administrative units with reference to said county administrative units.

   To the same effect is N.C.Gen.Stat. § 115–4, which provides in pertinent part:

   All administrative units, whether city or county, shall be dealt with by the State school authorities in all matters of school administration in the same way.

4. State legislation mandates this procedure. C. 770 [1969] N.C. Session Laws, as amended,

c. 207 [1973] N.C. Session Laws. This is local legislation with specific reference to Robeson County; a law of general application, N.C.Gen. Stat. § 115–18 (1973 Supp.) provides that each county board of education shall consist of five members to be elected by the voters of the county at large. Despite this general statute there appears to be considerable local variation. The defendants maintain "that there are more than thirty other counties in North Carolina in which the electoral process is carried out in a manner similar to or identical with Robeson County." The plaintiffs, on the other hand, maintain that in Wake and Orange Counties, only the citizens residing within the county jurisdiction vote for the members of the county board, and only citizens residing within cities vote for the members of the city board.

In this connection, plaintiffs urge the variation among counties as a basis for invalidating the election scheme pertaining to Robeson County. *See* Dunstan v. Scott, 336 F.Supp. 206 (E.D.N.C.1972) (three-judge court). We need not deal with this issue. We only point out that there are salient differences between local variations in the laws governing elections for statewide offices and local variation in the architecture of local governmental units. *Compare* Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

both their own board and some members of the county board, county voters may vote only for members of the county board, with the result that each city electorate has exclusive voting power over the members of the board which operates their public schools, but the county electorate has exclusive power to elect only four of the eleven members of the board which operates their schools. It is the dilution in the county residents' voting power, by residents of the city jurisdictions, in the election of the seven members of the county board which are elected by the combined vote of county and city residents, which plaintiffs attack.

## II.

Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), is the principal authority we must apply. It held invalid a New York statute which limited the qualified electorate in certain school district elections to otherwise qualified voters who owned or leased taxable real property in the district, or who were parents or guardians of children enrolled in the local public schools. The purpose of the statute, as articulated by the state, was to limit the franchise in school district elections to those "primarily interested in such elections." It was held that the class of voters eligible to vote under the statute was too imprecise to withstand constitutional challenge, i.e., the statutory classifications permitted "inclusion [in the qualified electorate] of many persons who have, at best, a remote and indirect interest in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school

meeting decisions," 395 U.S. at 632, 89 S.Ct. at 1892. The conclusion of invalidity was reached by applying the standard of whether the statute's exclusions "sufficiently further a compelling state interest to justify denying the franchise to appellant and members of his class," 395 U.S. at 633, 89 S.Ct. at 1893, to the facts presented and the results achieved under the statute.

Of course *Kramer* was primarily a case of denial of the right to vote.[5] The instant case is one of an alleged dilution of the right to vote. Nevertheless, *Kramer* is apposite because, as said in Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964), "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." There can be no doubt that, unless the state can adduce a compelling justification, the votes of the residents of the county school board geographical area are unconstitutionally diluted in the election of the seven members of the county school board which the law directs to be elected on the combined votes of county and city voters. Thus, we conceive the legal question to confront us to be whether a *compelling* state interest justifies permitting residents of city school units to participate in the election of these seven members of the county school board. If not, the franchise is constitutionally over-inclusive.

The justification for city participation in the county election which was adduced by the state and accepted by the

5. The implied premise of *Kramer* was that a citizen in a given jurisdiction has an equal right to vote with other citizens. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), states the principle explicitly:

We have in the past noted approvingly that the States have the power to require that voters be bona fide residents of the relevant *political subdivision* . . . .. An *appropriately defined* and *uniformly applied* require-

ment of bona fide residence may be necessary to preserve the basic conception of a political community . . . . .

*Id.* at 343–44, 92 S.Ct. at 1004 (emphasis added); *see also, id.* at 336, 92 S.Ct. at 1000: [T]his Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens *in the jurisdiction* (emphasis added).

district court below is grounded in functions performed by the county board which are of common interest to all six jurisdictions. State law authorizes city and county boards to enter into cooperative agreements to carry out their responsibilities, N.C.Gen.Stat. §§ 115–27, 115–31, 115–35 to 53. This authority has been exercised; and, pursuant to formal contract or less formal agreement, the county board (1) administers the transportation system for the county as a whole, including the geographical confines of the five city boards;[6] (2) operates an Educational Resource Center for the benefit of all county and city pupils; and (3) administers a number of federally-funded projects, including an occupational project for the disadvantaged and a project to aid handicapped children.

In addition to these common functions performed by the county board by agreement, state law puts two other responsibilities on it with regard to the city boards of education. Under N.C.Gen. Stat. § 115–77 (1973 Supp.), the county board is authorized to transfer county property to city administrative or tax units. This authorization is severely limited, however. Transfer may be effected only upon petition of a majority of the property-owners and taxpayers, and only with the approval of both the State Board of Education and the city administrative unit. N.C.Gen.Stat. § 115–77 (1973 Supp.). Thus, the power of the county board is only the power of one participant in a consensual process. Finally, under old and seemingly unused state laws, two of the city boards are required to make annual financial reports to the county board. (Red. Springs —c. 34, § 13 [1913] Private Laws N.C.; Lumberton—c. 343 § 72 [1907] N.C. Session Laws.) It does not appear that these reports have ever been made or requested. Since the functions of the county board with regard to annexation and financial reports are, respectively, entirely consensual and entirely vestigial, we deem them of little significance.

We do not think that the city voters' interest in functions performed by the county board for the benefit of it and the city boards—student transportation, the Educational Resource Center, and the projects for special students—individually or collectively, amounts to a compelling state interest that city voters participate in the election of certain county school board members. We do not doubt that the fact that the county board performs some functions for the benefit of the city boards gives the electorate of the city boards an interest in the operation of the county board, justifying some voice and some control in how the joint functions are performed. But it must be remembered that the county board performs joint functions by *agreement* of the city boards and not because of any statutory mandate. The city boards are authorized by law to perform these functions and provide these services for themselves. In placing these responsibilities on the county board, the city boards could undoubtedly retain contractual rights of supervision and control over the county board's performance. Because the city boards can participate in this way in the centralized functions to the extent of their interest, electoral participation in the selection of county board members by residents of city school board districts is not supported by a compelling interest. In short, extension of the vote to city residents, while it serves the asserted policy of giving city residents a voice in the management of joint functions, makes the franchise over-inclusive because the policy can be served other than by dilution of the county residents' vote. Moreover, there is nothing in the record to suggest that the present agreements between the county and city boards are immutable. By mutual agreement, the various boards may subsequently decide to place

6. The record discloses that in order to further economy and convenience, the North Carolina State Board of Education encourages the school boards to enter into arrangements whereby a county school board will maintain and service school buses for the entire county.

the primary responsibility for the performance of one or more of these joint functions on one or more of the *city* boards.

Extension of the franchise to city residents and the consequent dilution of the vote of the county electorate is over-inclusive on another score. In addition to its centralized functions, the county board, like each city board, administers the schools in its own jurisdiction; there is no cooperative effort between the county and city boards in this area. The inevitable consequence of permitting the cities' electorates to vote for certain members of the county board is to give them a voice in the operation of the county schools in those noncooperative aspects of their operation in which there is no showing that they have any interest.

Because of the franchise's over-inclusiveness for the two reasons that we have identified, we conclude that the provisions of North Carolina law which permit qualified voters residing in city school districts in Robeson County, North Carolina, to vote in the election of certain members of the Robeson County Board of Education are invalid as denying equal protection of the laws.

### III.

On remand, the district court will enter a declaratory judgment in accordance with the views expressed herein. We leave to the district court, in the exercise of its sound discretion, the fashioning of other relief. Ultimately the formulation of a constitutional method of electing members of the Robeson County School Board is the prerogative of North Carolina. That opportunity should be afforded. The district court may well conclude to withhold further relief at the present time if an election is not imminent and if there is a likelihood that exercise of North Carolina's prerogative will be forthcoming.

Reversed and remanded.