**John William PHILLIPS and Jacqueline Phillips, for themselves and all other similarly situated, Plaintiffs,**

v.

**Madge BEASLEY, Mary Helen Andress, Gertrude Brewer, M. L. Hosmer, and J. Paul Singleton, Individually and as members of the Tuscaloosa County Board of Education, Probate Judge John Puryear, Sheriff Beasor B. Walker and Circuit Clerk Bertice Bennett in their official capacities as members of the Board of Election Supervisors, Defendants.**

Civ. A. No. CA 74–P–1162–W.

United States District Court,
N. D. Alabama, W. D.

March 2, 1978.

Edward Still, Birmingham, Ala., Neil Bradley, Atlanta, Ga., for plaintiffs.

Martin Ray, Tuscaloosa, Ala., for defendants.

Before VANCE, Circuit Judge, and GUIN, and POINTER, District Judges.

## MEMORANDUM OF OPINION

POINTER, District Judge.

Under provisions of applicable state law, members of the Tuscaloosa County Board

of Education are elected by the qualified voters of the entire county, even though part of the county is served by the separate school system of the City of Tucaloosa, which has its own appointed board of education. See 1975 Code of Alabama, § 16–8–1 et seq. In this action for injunctive relief against the county board members and certain county election officials, the plaintiffs—who reside in that part of the county outside the city school district—assert that their votes for members of the county board are being diluted, contrary to the fourteenth amendment, by the state's grant of franchise to city voters. The defendants have denied any unconstitutional diminution of plaintiffs' voting rights; and the cause was brought on for evidentiary hearing before a three-judge court on February 21, 1978.[1]

## I. NEED FOR THREE–JUDGE COURT.

■ This action is subject to the requirements of former section 2281 of the Judicial Code, the repeal of which by P.L. 94–381, 90 Stat. 1119, did not apply to actions commenced prior to August 12, 1976. The plaintiffs seek an injunction on not insubstantial federal constitutional grounds against continued enforcement of a general state statute by persons who, for purposes of § 2281, are considered to be state officials. Convening of a three-judge court was required; and plaintiffs' motion to dissolve the panel is denied. See *Sailors v.*

*Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967); *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

However, it must be conceded that the necessity for—and hence the propriety of—a three-judge court is rarely free from all doubt. Accordingly, to assure appealability, the judgment in this cause is being entered not only by the panel, but also, in the alternative, by the single judge to whom the case was initially assigned.

## II. CLASS ACTION.

■ Plaintiffs have sought to represent a class of some 45,000 persons residing in Tucaloosa County outside the territorial limits of the city school system. This request has been opposed by the defendants, the controversy centering during pretrial proceedings not on whether a class should be formed but rather on what class should be established.[2] At the time of the hearing the defendants altered their attack on the composition of the class requested by the plaintiffs,[3] and for the first time raised an issue as to plaintiffs' membership in any such class, *i. e.,* by neither admitting nor denying that plaintiffs were voters residing in the county outside the city school system. No evidence was presented at the hearing as to plaintiffs' status, and accordingly the defendants say that no class should be formed.

1. Proceedings in this cause, including the request for formation of a three-judge court, were delayed during the pendency of a similar case involving the Walker County Board of Education. See *Creel v. Freeman,* 531 F.2d 286 (CA5 1976), *reh'g denied,* 537 F.2d 1143 (CA5 1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977).

2. During pretrial proceedings, consideration was given to the possibility that the case should be broadened to an attack on the election of county board members in all counties with city school systems, thereby enlarging the putative plaintiff class and creating a putative defendant class. No such request, however, was ever formally made to the court; and, indeed, in view of variations in law (*i. e.,* special local legislation) and in facts (*e. g.* transfers of students and funds, "domination" by

city electors, consolidation of schools), the court concludes that the requirements of Rule 23 would not be met with respect to such an action.

3. The defendants note that the relief sought on behalf of the class requested by plaintiffs would leave some electors in Tuscaloosa without a vote, direct or indirect, in the selection of members of either board of education; *i. e.,* those residing in an area outside the city limits but in the city's school district. These persons would not, under plaintiffs' requested relief, have a vote in the election either of county board members or of the city governing body which appoints the city board members. This attack by defendants, in essence, goes to the merits of the claim made by plaintiffs, not to the question of class certification.

The absence of the named plaintiffs from the hearing does not, under the circumstances of this case, indicate any disinterest[4] or other impairment on their part. The case was scheduled for trial with only a week's notice to counsel, and the willingness of plaintiffs' counsel to be ready for trial on such short notice came at a time when the necessity for testimony from his clients was not anticipated. The defendants are, in essence, seeking to take advantage of a situation caused by their own default, their answers to the complaint not being filed until the day of the hearing, which was more than two years after the complaints had been served.

To the extent the defendants are by their answers questioning the actual existence of the plaintiffs, they have failed to satisfy the requirements of F.R.Civ.P. Rule 9(a), which mandates a specific negative averment together with supporting particulars. Nor should members of the Board of Elections Supervisors, who would have access to voting records of the county, be permitted under Rule 8(b) to disclaim knowledge or information as to whether the plaintiffs are, as alleged, voters residing in a particular portion of the county. The court concludes that under the circumstances of this case the belated attempt by the defendants to insist upon proof of the plaintiffs' status is ineffective and that the allegations in the complaint as to their residence and voting qualifications should be deemed to be admitted.

The court finds and concludes that the requirements of Rule 23(a), (b)(1) and (b)(2) are satisfied, and orders that the case be maintained on behalf of a class consisting of all persons residing in Tuscaloosa County outside the territorial limits of the Tuscaloosa City school system.

### III.  MERITS OF THE CASE.

#### A.  The Law.

The inclusion in county board electorates of city voters having their own board of education has been attacked, with different results, in two reported cases. *Locklear v. North Carolina State Board of Elections,* 514 F.2d 1152 (CA4 1975) (invalidating a local law pertaining to Robeson County, North Carolina); *Creel v. Freeman,* 531 F.2d 286 (CA5 1976), *reh'g denied,* 537 F.2d 1143 (1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977) (upholding a local law pertaining to Walker County, Alabama). As factual differences make neither decision dispositive of the case *sub judice,* it is appropriate to review briefly the applicable constitutional principles.

The federal constitution does not require that members of a school board be elected. *Sailors v. Kent County Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). However, if such persons are to be elected, the qualifications for voting must comport with the requirements of the equal protection clause of the fourteenth amendment. *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Under *Kramer,* a state must show a compelling justification for its denial to one group of otherwise qualified residents of the right to participate in a school board election.

The proposition is also well established that, under the fourteenth amendment, close scrutiny must be given to a state statute which apportions voting strength unequally among different voters, a dilution in the effectiveness of one's vote being tantamount to its partial denial. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In *Reynolds,* the Supreme Court held that the failure to apportion seats in both houses of a bicameral state legislature on a population basis constituted dilution in voting power of some voters on the impermissible factor of the place of their residence.

Attempting to apply these principles, the Fourth Circuit in *Locklear v. North Carolina State Board of Elections, supra,* held unconstitutional even a limited participa-

---

4. Plaintiffs' counsel believes that his inability to contact his clients during the week prior to

trial was probably due to their being away on a trip.

tion by city voters having their own school system in the election of county board members. Citing *Reynolds* as authority, the court there held that, to justify inclusion of city voters in the electorate, the state would have to demonstrate a "compelling state interest"—a standard found not satisfied merely by reason of the county board's providing transportation, special educational programs, and a learning resource center for the entire county. The opinion indicated that city residents would have no interest in the administration of county school [5] and that, with respect to cooperative ventures between the systems, they would be adequately represented by members of the city board.

The Fifth Circuit in *Creel v. Freeman, supra,* did not explicitly either approve or reject *Locklear,* being content to distinguish it factually. It would likewise be possible, albeit with greater difficulty, to distinguish the case *sub judice* from *Locklear*—for example, the fact that in Tuscaloosa County there has been an outflow of tax dollars from the City to the county board of education.

Deserving of greater attention and concern, however, is *Locklear's* requirement that the state show a "compelling interest" for inclusion of city voters in the county board electorate. As authority for this proposition, the Fourth Circuit relied upon *Reynolds,* a case involving the apportionment of voting power for election of the state legislature unequally among different groups of voters, all of whom were considered to have an equal interest in the bodies to be elected. A somewhat different problem is presented in the city-county school board situation, where the question is how suffrage should be granted among putative electors having different degrees of

interest in the special body to be elected. A requirement in these circumstances, as *Locklear* suggests, that the state show a compelling justification for *including* in the electorate those with the lesser interest might, indeed, conflict with a requirement under *Kramer v. Union Free School Districts, supra,* that the state similarly justify its *excluding* such voters. Also see *Evans v. Cornman,* 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970) (invalidity of state requirement which precluded residents of federal enclave from voting in Maryland elections).

To assert the inapplicability of *Kramer* on the basis that city voters do not reside in the county school district would be to beg the question, for the applicability of *Kramer* or of *Reynolds* cannot be determined until there is first defined the geographical area whose residents are deemed sufficiently interested in, or affected by, the body to be elected. Where the challenge on this initial issue is that the area has been improperly restricted, excluding those who have a significant (albeit lesser) interest in a general governing body to be elected, there is no great difficulty in requiring the state to justify its decision. See *Evans v. Cornman, supra; Little Thunder v. South Dakota,* 518 F.2d 1253 (CA8 1975). Where, however, the attack is that the area concerned with a special purpose body has been defined too broadly, *i. e.,* that too many people are given the franchise, a different standard must be employed. In this latter situation, those who claim their votes are being unconstitutionally diluted—not through apportionment or weighting schemes, but through franchising of additional voters—should bear the burden of demonstrating that the state's decision is irrational or otherwise impermissible.[6]

---

5. The discounting by the Fourth Circuit of any interest by city residents having their own schools in the schools operated by the county appears to be contrary to the comments of the Supreme Court in *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), where the Court indicated that persons without children (or with children attending private schools) might have a "distinct and

direct" interest in school matters even though they neither owned nor leased property taxed for school purposes. See 395 U.S. at 630, 632, fn. 15, 89 S.Ct. 1886.

6. The inclusion in the electorate of an identifiable group of voters having no significant interest in the body to be elected would certainly be irrational. Likewise, the attack could be made that the votes of racial minorities are impermis-

It was such a standard—and not that suggested in *Locklear*—that was apparently applied by the Fifth Circuit in *Creel v. Freeman, supra.* The court stated:

"The facts of this case clearly show a substantial interest of Jasper and Carbon Hill residents in the operation of the Walker County school system and do not show domination by such residents over county school board elections. Accordingly, [plaintiffs] have not met their burden of demonstrating that the Alabama statutes and their application here are irrational or wholly irrelevant to the state's objective of electoral participation in the selection of county school board members. * * * Moreover, [plaintiffs] have failed to sustain their burden of showing that their proposed 'fencing out' of Jasper and Carbon Hill residents from voting in county board elections is required by a compelling state interest. * * * We are persuaded to [leave matters of common interest to the two systems] to agreement between the city school boards and the county school board rather than to a rational and relevant plan established by the Alabama legislature, particularly when there is no evidence of invidious discrimination which might arise from domination of elections by Jasper and Carbon Hill voters, would be to unnecessarily intrude upon an area reserved to the singular capability and responsibility of the legislature." 531 F.2d at 288–89.

The plaintiffs therefore have the burden to show that residents of the City of Tuscaloosa have an insubstantial interest in the operation of the county schools or that the inclusion of such persons in the electorate constitutes an invidious discrimination against those living outside the city.

### B. The Facts.

■ The principal state laws governing the operation of city and county schools in Tuscaloosa are derived from Alabama's School Code of 1927 and are presently found in Title 16 of the 1975 Code of Alabama. Under these laws, when the city decided to form its own school board, the general supervision and administration of the public schools were divided between the city and county boards according to their respective geographical areas. §§ 16–8–8, 16–11–1, 16–11–2, 16–13–199. While the two boards are normally expected to operate independently of one another respecting school affairs in their areas, there are a number of exceptions, *e. g.,*

the option to consolidate city and county schools under the county board (§§ 16–8–8, 16–8–17); the option to consolidate county areas into a city school district under the city board (§§ 16–13–195, 16–13–196); the option to operate jointly vocational schools (§ 16–37–8); the option to provide consolidated high schools (§ 16–26–2); the option to employ jointly attendance (or truant) officers (§ 16–28–19); the interim retention of control by the county board of schools located in areas annexed to the city (§ 16–8–20); the preclusion of the city's levying ad valorem taxes for school purposes unless the county is levying and assessing a school tax (§ 16–13–182); the apportionment by the county board of the county-wide four-mill school tax (§ 16–13–34).

Whether because of these topics of optional or required interaction between the two systems or because of a more fundamental basis for mutual interest in the operation of the two systems, the legislature has provided for distribution of annual reports of each system's conditions, accomplishments, and needs to citizens of the entire county. §§ 16–8–37, 16–11–24.

Transfers of students from one system to the other are limited, each system having been the subject of court-ordered desegregation plans which generally preclude such

---

sibly diluted, under cases such as *Zimmer v. McKeithen,* 485 F.2d 1297 (CA5 1973) (en banc), and *Nevett v. Sides,* 533 F.2d 1361 (CA5 1976). Note that even in the racial dilution situation, the plaintiffs are called upon to demonstrate the impropriety of the election process—a principle which reinforces the decision here made to place the burden of proof on the plaintiffs.

transfers. There are, however, some situations in which "cross-overs" have been permitted. Thus, city residents are received into the center for multi-handicapped students, operated by the county board; and the county board transports students from four of its schools to the city's vocational school. On occasion, individual student transfers between the two systems have been allowed to meet special disciplinary or other similar problems. Each system, moreover, offers adult-oriented "community education" courses, which are not limited to residents of their respective jurisdictions; and many city residents have participated in these courses offered by the county board.

City residents provide a substantial part of the local tax funds which support the programs of the county board. Under the formula for dividing the county-wide 4-mill school tax between the two systems, the county board in essence receives some $90,-000.00 annually from the taxes collected on properties in the city.[7] An even greater "city contribution" to the county board no doubt results from a formula which gives to each board an equal share of the $.02 county-wide sales tax.[8] Moreover, the offices of the county board, which are located in the city, are provided through general fund revenues collected from the entire county.

A majority of those who teach in the county system are residents of the city, and their interest in the election of county board members cannot be seriously questioned. The interest of city residents in county school matters is also indicated by the degree of participation by city voters in the county board elections, which is not significantly different from the level of participation by "county" voters, and by the fact that a number of city residents have sought election (or, in the case of a vacancy, appointment) to the county board. In the past a city resident in fact served on the county board. The sense of "community" is not, it would seem, totally coincident with political boundaries.

On the other hand, notwithstanding the potential created by reason of the greater number of voters living in the city, the evidence does not show domination by city voters in the biennial elections of county board members. All five of the incumbent members live in areas outside the city school district; and the only occasion shown to the court in which the "city vote" caused a difference in the person elected was for one position in the 1970 elections.

In summary, the court concludes that, in the context of the situation shown by the evidence respecting Tuscaloosa County, the residents of the City of Tuscaloosa do have a substantial interest in the election of members of the county board of education. The plaintiffs have failed to show that the state's grant of franchise to such persons is irrational or otherwise constitutionally impermissible. Whether the interests of the state would be better served by limiting the electorate to residents who have a greater interest in that body, *i. e.,* the plaintiff class, is not for the court, but for the legislature.

## IV. ATTORNEYS' FEES.

In an action under 42 U.S.C. § 1983, attorneys' fees can now be awarded to the prevailing parties. 42 U.S.C.A. § 1988. When considering, however, the award of such fees to defendants who have prevailed, the court believes that the standards to be applied are those recently enunciated by the Supreme Court with respect to similar provisions of Section 706(k) of Title VII of the Civil Rights Act of 1964. See *Christiansburg Garment Co. v. E. E. O. C.,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

---

7. According to the per-mill assessments in the two systems shown on DX–1, the 4-mill county-wide tax, which in fact is distributed almost equally between the two systems, would, if based on the situs of properties, have been divided $527,171 to the city board and $343,732 to the county board.

8. Not only do almost two-thirds of the residents live within the city, but it would hardly be disputed that the substantial majority of business establishments are located in the city. The sales tax is the principal source of local tax support for the county board.

The case *sub judice,* while found in favor of the defendants, was not, in its institution or maintenance, an unfounded, meritless, frivolous, or vexatious action. Accordingly, no award of attorneys' fees will be made against the plaintiffs.

Judgment will be entered by separate order.