Dan, Barbara and Sybil COLLINS, Anthony and Barbara Constantino, Philip and Geraldine Schmer, Ronald and Barbara Vitello, and Thomas and Libbie Ann Wills, Plaintiffs,

Dan, Barbara and Sybil Collins, Philip and Geraldine Schmer, Ronald and Barbara Vitello, and Thomas and Libbie Ann Wills, Plaintiffs–Appellants,

v.

TOWN OF GOSHEN, William J. Flannery, Joseph R. Donovan, Raymond Myruski, Harold E. Roegner, Horace C. Sawyer, William Johnson, Foster Greenhill, John Matta, Richard S. Gillette and Joseph P. Brown, Defendants–Appellees.

No. 100, Docket 80–7312.

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1980.

Decided Oct. 22, 1980.

Donald E. Klein, Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, for plaintiffs–appellants.

Gilbert Epstein, Dennis P. Caplicki, Goshen, N. Y., for defendants–appellees.

Before FRIENDLY and MESKILL, Circuit Judges, and BONSAL, District Judge.*

FRIENDLY, Circuit Judge:

Plaintiffs in this action, filed on September 1, 1978, in which federal jurisdiction is predicated on 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(3), are the owners of five of the approximately 235 homes in the section of the Town of Goshen in Orange County, N.Y., known as Arcadia Hills. The complaint vouchsafes no information about the defendants except that they are the Town "and those person [sic] who were or are Town Officers of the Town of Goshen within the meaning of §§ 20 *et seq.* of the Town Law of the State of New York during the period November 1973 to date, and are responsible for the matters complained of herein."[1]

The Town is a rural area of some 44 square miles. Its 8,000 residents live in four general areas. At the center is the Village of Goshen, a long established entity famed for its sulky horse racing, now inhabited by some 4,500 people. Just to the east of the Village is Hambletonian Park, a development of 156 single–family homes built in the early 1960's. Arcadia Hills, a development of 235 single–family homes built in the early 1970's, is situated roughly two miles south of the Village on the opposite side of the main highway that passes through the Town. The rest of the Town is rural.

Village residents receive their water supply from a group of nearby reservoirs operated by the Village Board. Residents of the rural portion of the Town obtain their water from privately owned wells. Hambletonian Park and Arcadia Hills receive their water supply from community well systems.

Arcadia Hills' water system, like the homes in that development, was initially constructed by a private developer. After conducting a public hearing, at which the complaint alleges there was "violent objection" by homeowners of Arcadia Hills who claimed the existing system was inadequate, the Town Board, acting pursuant to New York Town Law § 190 *et seq.*, on November 12, 1973, created the Arcadia Hills Water District (AHWD) and accepted a transfer of the developer's water system. The resolution, which contained a paragraph stating that it was "subject to a permissive referendum as provided in Section 109–g of the Town Law", was shortly thereafter published in a notice in a local newspaper. No referendum having been requested, defendant Flannery, a Town supervisor, acting in the name of the Town and on behalf of the AHWD, applied on January 16, 1974, to the New York State Department of Environmental Conservation for approval of the Town's plan to acquire the developer's water supply and distribution system. A hearing on this application was held in the Goshen Town Hall. There were objectors, whose identity is not described in the Hearing Officer's report, who asserted that the developer's "water supply system is inadequate and that the Town should not be saddled with an inadequate water supply system." Noting a concurrent decision authorizing the incorporation of four new wells into the system, the Commissioner of the Department of Environmental Conservation, on August 23, 1974, approved the application on certain conditions stated by him.

Plaintiffs' personal and economic grievance is that they have been getting too little water and having to pay too much for it, particularly in comparison to residents of the Village. Their primary basis for translating this understandable human feeling

---

* United States District Judge for the Southern District of New York, sitting by designation.

1. The record does reveal that defendants Flannery, Donovan, Myruski, Roegner and Sawyer voted for the resolution dated November 12, 1973, referred to *infra*.

into a § 1983 action is an allegation that homeowners in Arcadia Hills, many of whom formerly resided in or near New York City or other metropolitan areas, have been regarded as "outsiders" by "the general population of the Town of Goshen and by the Town Officers who are named in the complaint" and have suffered discrimination at the hands of the Town Board because they live "on the other side of the tracks", see *Hawkins v. Town of Shaw, Mississippi,* 437 F.2d 1286 (5 Cir. 1971), adhered to by a divided court *en banc,* 461 F.2d 1171 (1972), where, however, "the other side of the tracks" was inhabited by the town's poor black citizens. Plaintiffs claim that they have been "effectively disenfranchised" and thereby rendered powerless to correct the alleged discrimination since Arcadia Hills residents constitute no more than 15% of the total electorate eligible to vote for members of the Town Board. They also assert that Town officials have been unresponsive to their claims. Plaintiffs asked the district court to enjoin defendants from failing to provide the homeowners of Arcadia Hills with safe and adequate water service and from charging rates more than the court found to be fair and reasonable.[2] Damages were also sought. Defendants moved, with supporting affidavits, to dismiss the complaint for lack of jurisdiction and failure to state a claim upon which relief could be granted; they also asserted that the claim for money damages was time-barred.

Treating defendants' motion as one for summary judgment, see F.R.Civ.P. 12(c) and 56, the district court dismissed the complaint. The bulk of its opinion was devoted to the statute of limitations, which it seemingly held to bar equitable relief as well as damages. However, the court went on to say that the standard for determining plaintiffs' equal protection claims was the rational basis test rather than strict scrutiny since the challenged action did not create a suspect classification or impinge upon a fundamental interest; that "[p]articularly

given the Town Board's broad discretion regarding the establishment of water districts, see N.Y. Town L. § 190 (McKinney's 1965), its creation of a separate water district for the Arcadia Hills area cannot be said to constitute irrational governmental action"; and that "[t]here is no constitutional imperative that every special purpose district be administered by only those with a special interest in the subject matter, particularly when individuals residing outside the district also have an interest in the subject matter. See *Concerned Citizens v. Pine Creek Conservancy District,* 429 U.S. 651, 652 [97 S.Ct. 828, 51 L.Ed.2d 116] (1977); cf. *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 71 [99 S.Ct. 383, 390, 58 L.Ed.2d 292] (1979)."

Consideration of the statute of limitations defense is rendered difficult by the unfocused nature of the complaint. It was common ground that since the Civil Rights Act has no period of limitations, a federal court will apply the most analogous statute of limitations of the state where the court sits, see *Board of Regents of the University of New York v. Tomanio,* 446 U.S. 478, 483–484 & n.4, 100 S.Ct. 1790, 1794–95, & n.4, 64 L.Ed.2d 440 (1980); that in this case the appropriate period was the three–year limitation provided by NYCPLR § 214(2) for suits "to recover upon a liability . . . created or imposed by statute", see *Kaiser v. Cahn,* 510 F.2d 282, 284 (2 Cir. 1974); and that under that statute periods of limitations must be "computed from the time the cause of action accrued to the time the claim is interposed." NYCPLR § 203(a). Speaking in language generally used in actions for conspiracy, the district court thought the statute started to run with the last "overt act", here the resolution of November 12, 1973, establishing the AHWD and placing it under the control of the Town of Goshen. The court relied heavily on *Kadar Corp. v. Milbury,* 549 F.2d 230 (1 Cir. 1977).

**2.** Although the prayer for relief did not ask that administration of the AHWD be vested in a body elected solely by Arcadia Hills residents, the parties and the district court have treated it as if it had.

Since we conclude that summary judgment was properly granted for defendants on the merits, we need not consider the correctness of the district court's limitations analysis in general or the applicability of the *Kadar* decision in particular. We likewise need not consider the troubling question, noted by two other panels, whether the Supreme Court's recent decision in *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), might require application of some limitations period other than that provided by § 214(2). Compare *id.* at 618, 99 S.Ct. at 1916 ("§ 1983 does not provide any substantive rights at all") with *State v. Cortelle Corp.*, 38 N.Y.2d 83, 378 N.Y.S.2d 654, 655 (1975) (§ 214(2) does not apply to "statutory provisions which provide only additional remedies or standing [but] do not create or impose new obligations"). See *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 449 n.6 (2 Cir. 1980); *Singleton v. City of New York*, 632 F.2d 185, 189–190 (2 Cir. 1980). We likewise need not decide whether in any event plaintiffs' claims for equitable relief are governed by the six–year period of limitations provided by NYCPLR § 213(1) rather than by the three–year period of NYCPLR § 214(2). See *Singleton, supra*, 632 F.2d at 190.

■ It is not clear precisely what plaintiffs' disenfranchisement claim is. Allowing all qualified voters in the Town to vote for the Town Board is surely not unconstitutional since the board performs many town–wide functions. Even if there are constitutional limits on at–large voting aside from situations in which such a scheme has been deliberately used to disadvantage a racial or ethnic minority, they surely have not been reached in a township of this size and character. The claim thus must be that it was a denial of equal protection to allow the Town Board, elected by all the voters and predominantly by those in the Village, which controls its own water supply, to manage the AHWD.[3]

This is not a case in which persons denied the franchise challenge their exclusion from the ballot box. Plaintiffs have the right to vote in the elections in which the officials that govern their water district–the members of the Town Board–are chosen. This case therefore is not controlled by the Supreme Court's decisions concerning schemes "*denying* the franchise to citizens who are otherwise qualified by residence and age." *Kramer v. Union Free School District*, 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969) (emphasis in original) (applying strict scrutiny to a statute limiting the electorate in certain school board elections to owners or lessees of taxable property, their spouses, and the parents and guardians of school children). But cf. *Salyer Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) (applying the rational basis standard to a measure limiting the vote in general elections for a water storage district to persons who owned land in the district). However, as the Court noted in *Holt Civic Club v. City of Tuscaloosa, supra*, 439 U.S. at 69, 99 S.Ct. at 389, *Salyer* stands only for the proposition that in some instances a "State may constitutionally disenfranchise residents who lack the required special interest in the subject matter of the election", not for the proposition that it must. *Salyer* thus does not support a con-

---

3. Although this claim is strongly pressed in brief and argument it is clear that not all of the ills of which plaintiffs complain would be remedied simply by having AHWD managed by a board elected solely by its residents. The prayer for relief in the complaint indicates that plaintiffs' real desire is to have the Town provide AHWD with water equal in quantity and cost to that in the Village and in Hambletonian Park. We have been cited no authority supporting the proposition that when a town undertakes to manage a new water district with an inadequate water supply, equal protection demands that the town equalize the rates and supply in that district with those in other water districts in the town which, through effort or good fortune, are more happily situated. Contrast *Hawkins v. Town of Shaw, Mississippi, supra*, 437 F.2d 1286, where the court found racial discrimination in the provision of municipal services. See, however, *Washington v. Davis*, 426 U.S. 229, 244–45 & n.12, 96 S.Ct. 2040, 2049, 2050, 48 L.Ed.2d 597 (1976).

tention that non–residents of AHWD must be excluded from having a voice in its affairs.

As indicated, what plaintiffs object to is that the officials in charge of their water district are elected by all the residents of the Town, not just the residents of Arcadia Hills. The Supreme Court has dealt only glancingly with claims by persons who have the vote that extension of the franchise to others with a lesser interest in an election impermissibly dilutes their voting power, see *Spahos v. City of Savannah Beach*, 371 U.S. 206, 83 S.Ct. 304, 9 L.Ed.2d 269 (1962), *aff'g per curiam* 207 F.Supp. 688 (S.D.Ga. 1962) (sustaining statute allowing owners of property in town who were residents of county to vote in town elections along with town residents and providing that three town councilmen would be elected from among such nonresidents; three–judge district court had applied rational basis standard). However, the courts of appeals have been confronted with this problem and, with a single exception, have applied the rational basis test.

Most important for us is *Clark v. Town of Greenburgh*, 436 F.2d 770 (2 Cir. 1971). The Town of Greenburgh was divided into six incorporated villages, each "substantially self–governing", *id.* at 771, and an unincorporated area. The primary function of the Town Board was to govern the unincorporated area. The residents of the unincorporated area challenged the inclusion of the village residents in Town Board elections. This court held that the claim was so plainly insubstantial that the district court had acted properly in dismissing the complaint and refusing to convene a three–judge court. The court found it significant that village residents were taxed for about five percent of the Town budgets and received the benefit of some of the Town's facilities. *Id.* at 772.

In *Creel v. Freeman*, 531 F.2d 286 (5 Cir. 1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed. 784 (1977), the Fifth Circuit, following its earlier decision in *Gleason v. Mayor and Councilmen of Savannah Beach*, 346 F.2d 135 (5 Cir. 1965), which had involved the same Georgia statute at issue in *Spahos, supra*, and which had similarly applied the rational basis test, held that permitting the residents of the cities of Jasper and Carbon Hill, who voted for officials who in turn appointed their independent city school boards, to vote also for five members of the county board of education and for the county superintendent, who had jurisdiction over the rest of Walker County, did not unconstitutionally dilute the votes of other county residents. The court noted that Jasper provided space for the county board of education and contributed money to the construction of a county vocational school located in Jasper, and that roughly two–thirds of Jasper property taxes went to the county. *Cantwell v. Hudnut*, 566 F.2d 30 (7 Cir. 1977), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1015, 59 L.Ed.2d 71 (1979), upheld an Indiana statute which, *inter alia*, allowed four city–county councilmen elected at large from the entire area of Indianapolis and Marion County to sit on the councils of special police and fire districts consisting of only parts of the area of the unified city·county government.

In contrast to these decisions is *Locklear v. North Carolina State Bd. of Elections*, 514 F.2d 1152 (4 Cir. 1975). The school systems in Robeson County were run by five city boards of education each having exclusive jurisdiction over the schools within the city, and a county board having similar jurisdiction over the schools which were not within any of the five cities. Whereas each city board was elected exclusively by residents of the city, seven members of the county board were elected by all voters in the six jurisdictions, and four solely by residents of the county who were not residents of any city. Applying strict scrutiny, the court held that the inclusion of city residents in the election of seven of the eleven members of the county board unconstitutionally diluted the votes of county residents who did not live in any of the cities. The court found no "compelling interest" to justify inclusion of the city residents; the functions performed by the county board of common interest to all six jurisdictions— "student transportation, the Educational

Resource Center, and the projects of special students", *id.* at 1155–did not meet this exacting standard.

This decision, distinguished in *Creel, supra,* 531 F.2d at 289, was disapproved in *Phillips v. Beasley,* 78 F.R.D. 207 (N.D.Ala. 1978) (three–judge court), where the court found no equal protection infirmity in an arrangement whereby "members of the Tuscaloosa County Board of Education are elected by the qualified voters of the entire county, even though part of the county is served by the separate school system of the City of Tuscaloosa, which has its own appointed board of education". *Id.* at 208–09. The court stated that the reliance in *Locklear* on the statement in *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964), quoted in the margin[4] to justify the application of strict scrutiny was misplaced since *Reynolds* concerned "the apportionment of voting power for the election of the state legislature unequally among different groups of voters, all of whom were considered to have an equal interest in the bodies to be elected", whereas "in the city–county school board situation . . . the question is how suffrage should be granted among putative electors having different degrees of interest in the special body to be elected." *Id.* at 211. The court proceeded to declare that in the latter situation plaintiffs must demonstrate that the challenged inclusion is irrational because the included voters have only an insubstantial interest. *Id.* at 211–12 & n.6. See generally Note, State Restrictions on Municipal Elections: An Equal Protection Analysis, 93 Harv.L.Rev. 1491 (1980).

Because the gravamen of plaintiffs' objection here is that their water district is managed by officials elected by the entire Town, their claim must be judged by the rational basis standard. We hold that the scheme in question satisfies that standard. We were told at argument that, because of delays in payment of water bills by Arcadia Hills residents, the Town Board has often been obliged to advance revenues raised by town taxes in order to prevent the discon-

tinuation of services. There was thus a rational basis for confiding the management of AHWD to the Town Board, as had been done previously in the case of Hambletonian Park. So far as appears, no one ever proposed that administration of AHWD be vested in a board elected only by residents; the protests at the time of its creation were that the Town should not be burdened with an inadequate system and that the developer should be required to improve it.

The mere fact that the Village had long been allowed to control its own water supply did not require that other areas in the Town should be allowed to do so. As said in *Avery v. Midland County,* 390 U.S. 474, 485, 88 S.Ct. 1114, 1120, 20 L.Ed.2d 45 (1968):

> The Constitution does not require that a uniform straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems.

The Constitution would *permit* the Town to vest management of the district in a body elected solely by Arcadia Hills residents, see *Salyer, supra,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659, but it does not *require* the Town to do so. The choice of members of the Town Board doubtless rests on a variety of considerations, not simply on their sympathy, or lack thereof, for the water problems of Arcadia Hills residents. Even if the successful candidates come largely from the Village, they are representatives of the entire Town. See *Fortson v. Dorsey,* 379 U.S. 433, 438, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965); *Dusch v. Davis,* 387 U.S. 112, 115, 87 S.Ct. 1554, 1555, 18 L.Ed.2d 656 (1967); *Dallas County, Alabama v. Reese,* 421 U.S. 477, 479–81, 95 S.Ct. 1706, 1707–08 (1975). How well they serve the interests of each segment of the Town is not the concern of the federal courts. Cf. *Sugarman v. Dougall,* 413 U.S. 634, 657, 93 S.Ct. 2861, 2865, 37 L.Ed.2d 853 (1973) (Rehnquist, J., dissenting) ("It would hardly take extraordinary ingenuity for a lawyer to find 'insular and discrete' minorities at every turn in the road.").

---

**4.** [T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

Turning to the complaints of discrimination in the administering of AHWD, we find these to be of two sorts. The first is that the residents of the district pay more for their water than do the residents of the Village. However, an affidavit of a member of the Town Board showed that rates in AHWD were computed solely on the basis of its costs. It is hardly strange that rates for a small district dependent on wells exceed those for a large village supplied with reservoirs; there was no showing that the Town Board deliberately maintained high rates in AHWD for the benefit of other town services or even that high rates in AHWD could have that effect. The other complaint was that the Board had not been sufficiently aggressive in seeking out new water supplies. Even if we were to assume that deliberate failure to engage in such an endeavor, for which the district itself would have to pay, N.Y. Town Law § 202-b (McKinney's 1965), could give rise to a constitutional claim, appellants' affidavits with respect to such a failure were insufficient to raise a triable issue of fact.

Affirmed.