Stephen Kenneth DUNCAN; Patricia Willis Duncan; Robert Paul Howard; Martha J. Howard; Dale Anthony West; Mary Ann West; Tommy S. Hancock; Martha S. Hancock; David M. Cahill; Carolyn R. Cahill; James G. Jarrell; and Mary Lynn Felts, for themselves and all others similarly situated, Plaintiffs–Appellants,

v.

COFFEE COUNTY, TENNESSEE; James Wilhelm, Coffee County Executive; Connie Casteel, Registrar of Voters for Coffee County, Tennessee; and Gary Cline, Chairman of the Coffee County Election Commission, Defendants–Appellees.

No. 94–5746.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 1, 1995.

Decided Nov. 1, 1995.

**90**

H. Thomas Parsons (argued and briefed), Parsons and Nichols, Manchester, TN, for Stephen K. Duncan, Patricia W. Duncan, Robert P. Howard, Martha J. Howard, Dale A. West, Mary A. West, Tommy S. Hancock, Martha S. Hancock, David M. Cahill, Carolyn R. Cahill, James G. Jarrell and Mary L. Felts.

Robert F. Hazard (argued and briefed), Copeland, Conley & Hazard, Tullahoma, TN, for Coffee County, Tennessee and James Wilhelm.

Christine A. Modisher, Asst. Attorney Gen., Office of the Attorney General, Criminal Justice Division, Nashville, TN, Michael W. Catalano, Deputy Attorney Gen. (argued and briefed), Office of the Attorney General, General Civil Division, Nashville, TN, for Connie Casteel and Gary Cline.

Before: JONES and BOGGS, Circuit Judges; and CHURCHILL, District Judge.[*]

BOGGS, Circuit Judge.

Plaintiffs–Appellants appeal a judgment in this voting rights case in favor of Defendants–Appellees (collectively referred to as "Coffee County"). The district court entered the judgment in favor of Coffee County after the parties agreed to stipulated facts and presented oral argument. For the reasons set out more fully below, we affirm.

**I**

Coffee County, Tennessee is divided, for educational purposes, into three residential groupings. The first two include residents of the incorporated cities in the county, Tullahoma and Manchester. The third group consists of those who live in the remaining area outside the two cities. They are considered to be living in "Rural Coffee County."

The city of Tullahoma has 16,750 residents, and constitutes 42% of the Coffee County population. Manchester has a population of 7,700 and constitutes 19% of the Coffee County population. Rural Coffee County has 15,850 residents and constitutes 39% of the Coffee County population.

The three residential groupings correspond to three separate school districts. Tullahoma's district consists of kindergarten through 12th grade and has approximately 3,000 students. Rural Coffee County has its own school system (referred to herein as the "Rural Coffee County School District"). It has 3,628 students from kindergarten through 12th grade. Manchester's district consists of kindergarten through 9th grade, with approximately 1,200 students. Once Manchester students reach 10th grade, they attend the Rural Coffee County school system.

In 1992, Tennessee adopted the Education Improvement Act, Tenn.Code Ann. § 49-2–201. Among its myriad provisions were changes in the method of electing local school boards. At least in part, Tennessee designed the changes to cure problems with Tennessee's prior method of electing school boards, which, Tennessee concedes, did not meet the constitutional "one person-one vote" standard. The law applies statewide and there is

---

[*] The Honorable James P. Churchill, United States District Judge for the Eastern District of Michigan, sitting by designation.

no claim that the law was fashioned to deprive any particular person or groups of persons of the right to vote. Instead, it is simply a school board reapportionment law, which is part of a larger education bill that applies neutrally to the entire state.

In response to the Act, counties, including Coffee County, passed resolutions reapportioning their school boards. Prior elections had been conducted pursuant to various private acts. In Coffee County, the Coffee County Commission reapportioned the school boards in Resolution 94–10. Before Resolution 94–10, the city of Tullahoma had only one seat on the Coffee County School Board. However, Resolution 94–10 reapportioned the districts so that, of the 7 seats, two were within the city of Tullahoma; two were mixed between the city of Tullahoma and Rural Coffee County; one was totally within Manchester; one was mixed between Manchester and Rural Coffee County; and one was within Rural Coffee County only. This reapportionment forms the basis of the plaintiffs-appellants' complaint. They are Coffee County residents (but not residents of Tullahoma), and claim that their votes are being unfairly "diluted" by the residents of Tullahoma. The plaintiffs maintain that the Tullahoma residents do not have sufficient interest in the Coffee County School District to vote for its school board. The Rural Coffee County residents do not object, in this case, to the extension of the franchise to Manchester residents.

As noted previously, since Manchester has no high school, its high school students attend Coffee County High School, along with Rural Coffee County students. Tullahoma residents, however, generally do not attend the Rural Coffee County schools because they have their own system of schools for kindergarten through high school. According to recent statistics, in 1993 one Tullahoma student enrolled in summer school in the Rural Coffee County School District, 36 Tullahoma students attended the Rural Coffee County school system during the regular school year, and 45 of the 229 adults enrolled in the Rural Coffee County School District adult education program were Tullahoma residents. Finally, there are no joint programs between the Tullahoma School District and Rural Coffee County School District.

All county residents are subject to property taxes to support education. Each residential grouping collects taxes and the amount of money each school system receives is based on its "ADA" or Average Daily Attendance. The city of Tullahoma collects $2,404,820 in property taxes, and returns $2,025,880 to its own Tullahoma School System. It sends the remaining $378,940 to the Rural Coffee County School system. Manchester collects $1,203,047 and retains $766,599 for the Manchester system. Manchester sends $436,448 to the Rural Coffee County School District. Rural Coffee County collects $1,908,466, but the Rural Coffee County School District, because of the transfers of money from city residents, spends $2,612,898 in local tax dollars.[1]

A local option sales tax also supports education. The Coffee County Commission divides the local tax into halves. The first half goes to education, and is distributed based on ADA. The Commission sends the second half to the collecting government, county, or municipality. One half of the sales tax collected by Tullahoma was $2,131,990 and $1,487,711 was returned to the Tullahoma School System. Therefore, approximately $644,000 was sent to the Rural Coffee County School District.

On April 4, 1994, Duncan filed his complaint in the district court, alleging that the votes of residents of Rural Coffee County and the town of Manchester were being "diluted" by the inclusion of voters from the city of Tullahoma in the Rural Coffee County School District elections. The plaintiffs sought injunctive and declaratory relief, claiming the reapportionment violated their rights to Equal Protection under the Fourteenth Amendment.

After a hearing on May 2, 1994, the district court ruled that the plaintiffs had failed to

---

1. This amount is $111,000 more than the sum of transfers to the Rural Coffee County School District and Rural Coffee County's own taxes. Neither party was able to explain at oral argument the missing $111,000.

prove that granting the franchise for Rural Coffee County School District school board elections to residents of the city of Tullahoma was irrational or constitutionally impermissible. On May 3, the court dismissed the complaint. The appellants filed this timely appeal on May 26, 1994.

## II

We review the district court's findings of fact, which the parties have stipulated to and do not dispute on appeal, for clear error. We review the conclusions of law *de novo.* Contrary to Duncan's assertion, the abuse of discretion standard of review plays no part in this case.

■ The issue presented for review is one that the Supreme Court has never directly addressed, and is one of first impression in this Circuit. Though the Supreme Court has never directly addressed the issue, its cases on closely related topics, and the extensive history of voting rights litigation, do provide several valuable reference points. First, "the conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders,* 372 U.S. 368, 381, 83 S.Ct. 801, 809, 9 L.Ed.2d 821 (1963). Therefore, it can be safely said that there is a presumption in favor of enfranchisement. The Supreme Court has also recognized that a straightforward ban on the franchise is not the only way that a citizen's right to vote can be abridged, for "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964).

■ In spite of this presumption, however, there is no per se rule against selective disenfranchisement. In particular, the Supreme Court has recognized that in "special interest" elections the government can limit the franchise to those who have the required special interest. *See Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 69, 99 S.Ct. 383,

389, 58 L.Ed.2d 292 (1978) (in "special interest election," state "may constitutionally disenfranchise residents who lack the required special interest that is the subject matter of the election"); *See, e.g., Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) *and Associated Enters., Inc. v. Toltec Watershed Improvement Dist.,* 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973) (vote for water conservation district's board of directors limited to landowners is constitutional even if apportioned according to assessed valuation). *Ball v. James,* 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981) (permitting abridgment of one person-one vote principle where votes were apportioned based on acreage for directors of agricultural improvement and power district).

■ Moreover, it is now well settled that "[b]ona fide residence alone ... does not automatically confer the right to vote on all matters." *Holt Civic Club,* 439 U.S. at 69, 99 S.Ct. at 389. Therefore, voters faced with disenfranchisement may have to do more than simply show that they live in the jurisdiction, though that is a powerful and often dispositive fact. *See, e.g., Hill v. Stone,* 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975) (invalidating provision of Texas Constitution restricting franchise on bond issue to residents who had listed property for taxation); *Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (invalidating statute limiting franchise in school board elections to those who owned real property or had children enrolled in the school); *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (invalidating poll tax imposed on otherwise qualified voters); *cf. Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (invalidating statute limiting membership on county school board to those residents owning real property). When the government properly classifies an election as a special interest election, which is admittedly a rare circumstance, the prospective voter may also have to demonstrate that special interest.

■ From these basic cases we can take several rules. First, there is a well-ground-

ed presumption in favor of the franchise. Second, vote dilution is as nefarious as an outright prohibition on voting. Finally, where a voter can show that he lives in the relevant political jurisdiction, the presumption of enfranchisement is particularly powerful, though not dispositive. Proof of residence (assuming compliance with other normal voting requirements) in many ways operates to place an onerous burden on the government to demonstrate that the topic of the election is sufficiently unique or distinctive that it can forego a universal franchise.

### III

Coffee County's first argument in support of the district court's judgment is that it *must* include the residents of Tullahoma because neither the County nor the State has a compelling state interest in excluding them. Coffee County claims that Tullahoma residents live in Coffee County, and as such, live in the relevant geopolitical entity. It relies in particular on *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

In *Kramer*, a New York school district tried to limit the vote to those owning or leasing taxable real property and those with children enrolled in the school system. The plaintiff was a 32–year–old childless stockbroker living at home. Therefore, he did not own or lease taxable realty or have children in the school system. In other words, his sole interest appears to be that he lived in the relevant geographic area.

The court held that such laws were not entitled to a presumption of constitutionality, or subject to a rational basis test. *Kramer*, 395 U.S. at 628, 89 S.Ct. at 1890 ("the deference usually given to the judgment of legislators does not extend to decisions concerning which resident citizens may participate in the election of legislators and other public officials"). Instead, laws that placed limits on the franchise beyond the normal citizenship, age, and residence requirements were subject to strict scrutiny and therefore, required a compelling state interest. *Ibid.* ("if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to

others, the Court must determine whether the exclusions are necessary to promote a compelling state interest").

■ It is now beyond challenge that a person living in the relevant geopolitical entity has a strong claim to the franchise, subject only to the traditional restrictions of citizenship, age, and residence and excluding some narrow special interest elections. "This court has made clear that a citizen has a constitutionally protected right to participate on an equal basis with other citizens *in the jurisdiction.*" *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 999–1000, 31 L.Ed.2d 274 (1972) (emphasis added). However, we think Coffee County's definition of the relevant geographic jurisdiction is mistaken.

■ The crucial phrase in *Dunn* is "in the jurisdiction." Here, that "jurisdiction" is not the whole county, as Coffee County would like us to believe. Instead, the proper definition of the appropriate jurisdiction is the Rural Coffee County School District. Therefore, Tullahoma residents do not reside in the relevant geopolitical entity: the Rural Coffee County School District. Instead they live in an adjacent political jurisdiction called the Tullahoma School District. The Supreme Court has made it clear that "our cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Holt Civic Club*, 439 U.S. at 67, 99 S.Ct. at 388.

In *Holt Civic Club*, the Supreme Court addressed an attempt by residents of a rural area outside the City of Tuscaloosa, Alabama to gain the right to vote in city elections. The plaintiffs presented a far more compelling argument that they must be granted the franchise than that found here. In *Holt Civic Club*, many rural residents were subject to Tuscaloosa police jurisdiction, to City Court jurisdiction and to city sanitation codes. Nonetheless, the Court held that the fact that the state extended certain powers of city agencies beyond their borders did not *require* the city to grant the franchise to rural residents because they were not residing within the geographic entity known as the City of Tuscaloosa. In the instant case,

the Coffee County School Board does not have such broad power over the residents of Tullahoma. For example, the power to lay and collect taxes is beyond the authority of the school boards. As *Holt Civic Club* demonstrates, even if the Board did have much broader powers, the Constitution would not *require* that Tullahoma residents be granted the franchise in the Rural Coffee County School District, because they simply do not live in the Rural Coffee County School District.[2] The Supreme Court has clearly stated that "[n]o decision of this court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions." *Id.* at 68, 99 S.Ct. at 388.

Therefore, because Tullahoma residents do not live in the relevant geopolitical entity called the Rural Coffee County School District, the state need not prove a compelling state interest to exclude them. As such, its first argument, that inclusion is mandatory, is unpersuasive.

## IV

■ This conclusion does not end our inquiry. Simply because the Constitution does not require Tennessee and Coffee County to include Tullahoma residents in the electorate for the Rural Coffee County School District does not mean they cannot, as an exercise of normal public policy making, extend the franchise to Tullahoma residents. They may do so, so long as they do not unconstitutionally dilute the votes of Rural Coffee County residents.[3] The issue, then, is at what point the inclusion of voters unconstitutionally dilutes the votes of Rural Coffee County residents. The Fourth, Fifth, and Eleventh Circuits have addressed this issue. We find persuasive their conclusion that the benchmark for determining whether the in-

clusion of "out-of-district" voters in another district's elections unconstitutionally dilutes those votes is whether the decision is irrational. A decision to include "out-of district" voters in the election is not irrational if Coffee County can show that those voters have a substantial interest in the Rural Coffee County School District election.

In doing so, we reject the standard advanced by the Fourth Circuit (to the extent it still governs) in *Locklear v. North Carolina State Bd. of Elections,* 514 F.2d 1152 (4th Cir.1975). In *Locklear,* the Fourth Circuit concluded that, because there was a claim of vote dilution, the state had to justify the inclusion of city voters based on a compelling state interest. Specifically, the court held that "we conceive the legal question to confront us to be whether a compelling state interest justifies permitting residents of city school units to participate in the election of these seven members of the county school board. If not, the franchise is [un]constitutionally over-inclusive." *Locklear,* 514 F.2d at 1154.

We conclude that the systematic use of the compelling state interest standard in cases such as this would be unworkable, and is not constitutionally required. The Fourth Circuit based its conclusion largely on the misuse of the term vote dilution. As we have noted previously, vote dilution is a term of art. Merely expanding the voter rolls is, standing alone, insufficient to make out a claim of vote dilution. The reason for this conclusion can best be illustrated by an example. If a political entity elects to alter its voting requirements, for example by lowering the voting age, it will expand the voting rolls. This dilutes the votes of those already registered to vote. But it does not do so unconstitutionally, even though the state does not have a compelling state interest in lowering the voting age. Similarly, if a state

---

2. Coffee County's argument appears to be grounded in the fact that Tullahoma residents are obviously also residents of Coffee County. But the dispute here is not between Tullahoma and the hierarchically greater political body of Coffee County. Instead, it is between two "co-equal" political entities, the Tullahoma School District and the Rural Coffee County School District.

3. Naturally, any time voters are added to the rolls, by a change in residence requirements for example, those already on the rolls have had their votes diluted. Therefore, "vote dilution" is properly understood to be a constitutional term of art. As such, mere expansion of the class of persons eligible to vote does not, *per se,* imply unconstitutional vote dilution.

cut its durational residence requirement in half, it would expand the rolls, but there would still not be an unconstitutional dilution of votes even though the state did not have a compelling state interest in altering the old residence requirement.

To hold otherwise would have either of two effects. It would make any expansion of the voting rolls subject to attack because the state did not have a compelling state interest warranting the change. This would leave the scope of the franchise static and virtually unchangeable. The second alternative is that courts, seeing the potential harm posed by the first, would subvert the compelling state interest test, a critical facet of our constitutional jurisprudence, and leave only the title, but not the substance. Therefore, we conclude that requiring a compelling state interest to justify expanding the franchise is unworkable and inappropriate for this case.[4]

In lieu of the test advanced in *Locklear*, a test advanced in a series of cases originally from the Fifth Circuit and developed by its successor, the Eleventh Circuit, provides a workable solution in line with current constitutional and Supreme Court mandates. Though not the most recent case on the issue, *Sutton v. Escambia County Bd. of Educ.*, 809 F.2d 770 (11th Cir.1987), contains the most significant discussion of the relevant standard. In *Sutton*, the Eleventh Circuit held:

> The party seeking to exclude city residents from voting in the county school board elections has the burden of demonstrating that the application of the Alabama statute here is irrational or wholly irrelevant to the state's objective of electoral participation in the selection of county school board members. The test for whether the statute is irrational … is whether the city residents have a substan-

tial interest in the operation of the county school system. If the city residents do not have a substantial interest, then the state must exclude the city residents from voting.

809 F.2d at 772 (citations omitted).

Unfortunately, having stated the test, the courts have found it difficult to apply consistently. *See Phillips v. Andress*, 634 F.2d 947, 952 (5th Cir. Unit B 1981) (Hill, J., dissenting) ("Dedicated and able members of the bar cannot be expected to know how to advise regarding the election of county school board members in the other 65 counties of Alabama. The panel majority's opinion is an invitation to litigants to bring them all to our court, one at a time, so that successive panels can say who may constitutionally vote for board members of each system"). *Compare Creel v. Freeman*, 531 F.2d 286 (5th Cir. 1976) *and Davis v. Linville*, 864 F.2d 127 (11th Cir.1989) (allowing out-of-district residents to vote) *with Phillips v. Andress*, 634 F.2d 947 (5th Cir. Unit B, 1981) *and Hogencamp v. Lee County Bd. of Educ.*, 722 F.2d 720 (11th Cir.1984) (forbidding out-of-district residents from voting).

Part of the problem stems from the attempts to reconcile *Kramer* and *Locklear* with the substantial interest test. For example, the *Sutton* court concluded, erroneously we think, that the decision to disenfranchise voters required a compelling state interest. Therefore, if the state's inclusion of voters was irrational, in that those voters did not have a substantial interest in the election, then the state would have a compelling interest in excluding them. This error is best illustrated by a quote from *Sutton*. "The voters sought to be excluded here, in addition to being city residents, are at the same time county residents, just as they are residents of the state and of the United States. Resi-

---

4. We note that this vote dilution claim does not involve any history of racial animus or any issue of discrimination. Concerns over educational segregation play a large part in many of the cases dealing with school board elections, *see, e.g., Sutton v. Escambia County Bd. of Educ.*, 809 F.2d 770, 772 (11th Cir.1987) (noting the lack of student crossovers between the two systems stemmed from court-ordered desegregation plans that effectively prohibited transfers). In our case, Blacks represent only 3.7% of the entire Coffee County population, so that racial concerns are minimal. Indeed, 75% of all Blacks live in Tullahoma, where they are compromise 7% of the population. Approximately 16% of all Blacks live in Manchester, where they constitute about 3% of the population, and about 9% of the Black population resides in Rural Coffee County, where they amount to 1% of the population. Therefore, extending the franchise to Tullahoma residents certainly does not diminish the power of Black voters.

dents of an area are normally qualified to vote in the elections of the governing bodies of those areas. To exclude them from elections in the county in which they reside requires a compelling state interest." *Sutton*, 809 F.2d at 774.

However, as we have discussed previously with respect to Coffee County's claim, this confuses the proper geographic jurisdiction in question. Although Tullahoma residents live in a political entity called Coffee County, they do not in this case live in the political entity that we call the Rural Coffee County School District. Similarly, in *Sutton* the City of Brewton residents lived in the Brewton school district, but they did not live in the *Escambia County* school district, *Sutton*, 809 F.2d at 771, and in *Phillips*, the City of Tuscaloosa residents lived in the Tuscaloosa City school district, but not the *Tuscaloosa County* school district. *Phillips*, 634 F.2d at 950. *See also Creel*, 531 F.2d at 286–88.

 While we disagree with *Locklear* and with *Sutton* as to the exact standard to be applied, those cases nonetheless provide important discussions of the various factors embodied by the substantial interest test. From *Locklear*, *Creel*, and their progeny it becomes apparent that courts have considered a few factors to be critical to determining whether there is a substantial interest. The factors to be considered include:

(1) The degree to which one district is financing the other;

(2) The voting strength of the non-resident voters;

(3) The number of, or potential for, cross-over students;

(4) The existence of any joint programs.

*1. The degree to which one district is financing the other.*

 In the instant case, we conclude that Tullahoma residents provide sufficient money to the Rural Coffee County School District that including them in the franchise is not irrational. Specifically, the 1992–93 figures disclose that Tullahoma money accounts for approximately 7.28% of the *total* Coffee County School expenditures. The break

down of these figures also supports this conclusion.

Tullahoma collects $2,404,820 from its property tax. Of this amount, it retains $2,025,880 for its own school district and sends $378,940 to the Rural Coffee County School district. Those figures mean that fully 15.75% of all Tullahoma property taxes go to the neighboring school district.

Equally persuasive is the percentage of the total local funds available to Rural Coffee County that are provided by Tullahoma residents. Rural Coffee County collects $1,908,466 in property taxes. Manchester sends $436,448 to the Rural Coffee County School District from its property tax revenues. Tullahoma sends $378,940 of its property tax revenues to the Rural Coffee County School District. Therefore, of the Rural Coffee County School District's total local property tax expenditures of $2,612,898, fully 14.5% comes from Tullahoma residents.

Though not as carefully described in the record (for some reason the amount of sales tax collected in Rural Coffee County is never disclosed), the sales tax figures support the same conclusion. The local option sales tax adopted by the Coffee County Commission pursuant to T.C.A. § 67–6–701 *et seq.* is divided into halves. State law mandates that half be used for education, and that money is distributed based on Average Daily Attendance. Half of the local option sales tax collected in Tullahoma is $2,131,990. The district court found, and Duncan does not dispute, that approximately $1,487,711 is retained by the Tullahoma school system. Therefore, $644,279, or approximately 30%, is sent to the Rural Coffee County School District.

These figures mean that Tullahoma sends approximately $1,078,940.81 to the Rural Coffee County School District. Compared with the total Rural Coffee County School District budget, from all sources (local, state, and federal), of $14,800,694, Tullahoma accounts for 7.28% of the budget. More importantly, when compared to the apparent total local revenues used by the Rural Coffee County School District of $5,120,227 (J.A. 86), Tullahoma accounts for 21% of all local

funds spent by the Rural Coffee County School District.

█ We conclude that where, as here, a city provides a substantial amount of its own sales and property taxes to a neighboring school district, and where those funds make up a sizable portion of the recipient's budget, the decision to make the city residents eligible to vote in the county school board elections is supported by a substantial interest and is therefore not wholly irrational.[5]

### 2. The voting strength of the non-resident voters.

█ Where the government allocates the franchise in such a manner that residents of a separate area have little or no chance to control their own school board, there may be grave constitutional concerns, even where out-of-district voters have a substantial interest. However, the constitutional concern is minimized where, as here, the apportionment of seats dictates that there is only the slimmest possibility that Tullahoma residents can control the Coffee County School Board, and then only if Rural Coffee County residents allow them to.

Pursuant to resolution 94–10, the Coffee County School Board has seven members. Seat one is totally within Manchester. Seat two is divided between Manchester and Rural Coffee County. Seat three is a combination of the city of Tullahoma and Rural Coffee County. However, the Rural Coffee County residents have a majority of the voters. Seat four is totally within the city of Tullahoma. Seat five is, like seat three, a combination of the city of Tullahoma and Rural Coffee County. However, again the Rural Coffee County residents have a majority of the voters. Seat six is totally within the city of Tullahoma and seat seven is totally in Rural Coffee County.

Therefore, Resolution 94–10 directly apportions only two of the seven seats to Tullahoma residents. Of the other two seats with Tullahoma residents, a majority of the population in each district resides in the Rural Coffee County School District. It is thus unlikely that Tullahoma residents will ever control the Coffee County School Board, and if they do it will only be with the electoral support of Rural Coffee County School District residents.

### 3. The number of, or potential for, crossover students.

The number of crossover students in the normal student body is minimal. Only one Tullahoma resident enrolled in the Rural Coffee County School District summer school. Thirty-six Tullahoma students attend the Rural Coffee County school system. This is only 1% of the Rural Coffee County school system.

Current adult education enrollment and recent changes in Tennessee law strengthen this factor. Currently, twenty percent of all adult education students are Tullahoma residents (45 out of 229). More importantly, recent changes to Tennessee law have resulted in a substantial liberalization of cross-district enrollment. *See* T.C.A. § 49–6–3104. Therefore, this factor is not a strong point for either side.

### 4. The existence of any joint programs.

There are currently no joint programs between the Tullahoma and Rural Coffee County School Districts. Therefore, this factor favors the Rural Coffee County School District's position that enfranchisement is irrational.

### V

Reviewing each of these factors, we conclude that the district court's holding that Tullahoma residents have a substantial interest in the operation of the Coffee County school district is correct. In particular, the amount of money sent to the Rural Coffee County School District is significant, and Tul-

---

**5.** The decision to include them is discretionary. Our conclusion that they do not live in the relevant geographical jurisdiction means that the state does not need a compelling interest to exclude them. Therefore, the decision to include them is the same type of discretionary legislative action as changing the voting age or residence requirements. Simply because Tullahoma residents have a substantial interest, such that it is not irrational to include them in the running of the Rural Coffee County School District, does not mean the state must include them.

lahoma has only the most minuscule mathematical chance to control the Coffee County School Board. That minuscule chance is, in the final analysis, completely dependent on the votes of Rural Coffee County residents. In other words, Tullahoma residents will not control the Coffee County School Board unless Rural Coffee County School District voters let them.

Admittedly, there is minimal cross-district enrollment, but we think the district court's conclusion that the recent changes in Tennessee law make it likely that such enrollment will increase is reasonable. Similarly, the existence of joint programs is not dispositive.

Therefore, because a substantial amount of money that would otherwise go to the Tullahoma schools is earmarked for the Rural Coffee County School District, and because that money makes up a sizeable portion of Rural Coffee County School District's budget, we conclude that the state could rationally decide in favor of enfranchisement. This conclusion is strengthened by the current method of apportionment and by the potential for increased cross-district enrollment. Finally, we agree with the Eleventh Circuit's conclusion that "[i]n close cases, the decisions dictate that overinclusiveness is less of a constitutional evil than underinclusiveness." *Sutton,* 809 F.2d at 775.

## VI

The judgment of the district court is **AFFIRMED.**