**BOARD OF COUNTY COMMISSIONERS OF SHELBY COUNTY, TENNESSEE, et al., Plaintiffs–Appellees,**

**Shelby County Board of Education; Herman Cox, et al., Intervenor Plaintiffs–Appellees,**

v.

**Charles W. BURSON, Attorney General & Reporter of Tennessee, Riley C. Darnell, Secretary of State of Tennessee; Brook Thompson, Election Coordinator of the State of Tennessee; and the Shelby County Election Commission, including O.C. Pleasant, Jr., Chair, David Lillard, Secretary, Gregory Duckett, Member, Anthony King, Member, and Myra Stiles, Member, Defendants–Appellants.**

No. 96–6278.

United States Court of Appeals, Sixth Circuit.

Argued April 29, 1997.

Decided July 29, 1997.

---

Brian L. Kuhn (briefed), Farris, Mathews, Gilman, Branan & Hellen, John L. Ryder (argued and briefed), Apperson, Crump, Duzane & Maxwell, Donnie E. Wilson (briefed), Shelby County Attorney's Office, Memphis, TN, for Board of County Commissioners of Shelby County, Tennessee, County of Shelby.

Richard L. Winchester, Jr. (argued and briefed), R. Lee Winchester (briefed), The Winchester Law Firm, for Shelby County Board of Education, Rubye Dobbins, Tom Brooks, Homer Bunker, Dennis F. Fields, Cheryl Hall, Karen Hill, Carolyn Bobo.

Lewis R. Donelson, III (argued and briefed), Baker, Donelson, Bearman & Caldwell, Robert M. Glover, Memphis, TN, for Herman Cox, Gene Fletcher, Bobby Flaherty, Sharon Goldsworthy, George Harvell, Jr., George Horton.

Clifford D. Pierce, Jr. (argued), Wyatt, Tarrant & Combs, Memphis, TN, for Amici Curiae.

Michael W. Catalano, Deputy Attorney Gen., Office of the Attorney General, General

Civil Division, Rachel L. Steele, Asst. Atty. General (argued and briefed), Office of the Attorney General of Tennessee, Michael E. Moore, Office of the Attorney General, Nashville, TN, for Defendants–Appellants.

Before: NELSON and NORRIS, Circuit Judges; COHN, District Judge.[*]

ALAN E. NORRIS, Circuit Judge.

Defendants appeal from the judgment of the district court holding that the election provisions of Tennessee's Education Improvement Act ("EIA"), as applied in Shelby County, Tennessee, violate plaintiffs' rights under the Fourteenth Amendment to the United States Constitution. This court has recently resolved a similar challenge to the EIA's election provisions in *Duncan v. Coffee County*, 69 F.3d 88 (6th Cir.1995), and our decision in that case controls the resolution of this appeal. While we held in *Duncan* that the EIA's election provisions were not unconstitutional as applied in Coffee County, application of the test established in that case leads us to conclude that the district court was correct in concluding that the election provisions are unconstitutional as applied in Shelby County. Accordingly, we affirm.

## I.

Shelby County, Tennessee, is comprised of two separate and distinct public school districts: the Memphis City Schools and the Shelby County School District. The Memphis City Schools provide elementary and secondary education to students residing within the City of Memphis,[1] while the Shelby County School District does the same for students residing in all of the parts of Shelby County which are not within Memphis city limits. Until recently, the members of the Shelby County Board of Education were appointed by the Board of County Commissioners of Shelby County.

According to the parties, the Tennessee Constitution, as construed by the state's highest court, requires that all popularly elected county officials, including county school board members, be elected by all voters within the county. *See* Tenn. Const. Article XI, § 17; *Southern v. Beeler*, 183 Tenn. 272, 195 S.W.2d 857, 865 (1946). In addition, the Tennessee legislature, by adopting the EIA, mandated that "[n]otwithstanding any other law to the contrary, there shall be a board of education elected by the people." Tenn.Code Ann. § 49–2–201. In order to comply with both the legislative mandate and the Tennessee Supreme Court's interpretation of the state's constitution, the Board of County Commissioners of Shelby County enacted a plan ("Plan C") which provided that members of the Shelby County Board of Education be elected from seven single member districts throughout the entire county. As a result, residents of the City of Memphis may vote in the Shelby County Board of Education elections even though their children attend school in a different system.

According to the 1990 United States Census, 826,330 people reside in Shelby County. Of that number, 618,289 reside within the City of Memphis, thus accounting for 74.8% of the county's population.[2] This overwhelming numerical dominance of Memphis residents over non-Memphis residents in the county is reflected in the make-up of the voting districts in Plan C. The percentage of Memphis residents residing in each district is as follows:

| | Memphis Residents |
| --- | --- |
| District 1 | 71.6% |
| District 2 | 92.2% |
| District 3 | 88.6% |
| District 4 | 71.5% |
| District 5 | 62.9% |
| District 6 | 100.0% |
| District 7 | 33.1% |

---

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1] The Memphis school system was established by a private act in 1868, and its geographical boundaries are coterminous with the boundaries of the City of Memphis. Since its creation, it has been governed by a board of directors elected by persons who live in the city.

[2] That ratio appears not to have changed since the 1990 census, if voter registration figures are any indication. As of May 1, 1996, there were 512,245 registered voters in Shelby County. Of that number, 365,240 live in Memphis, accounting for 71.2% of all county voters.

Thus, under Plan C, Memphis residents form a substantial voting majority in six out of the seven voting districts.[3]

On May 3, 1996, Shelby County and the Board of County Commissioners ("plaintiffs") filed a complaint in federal district court challenging the constitutionality of Plan C and seeking declaratory and injunctive relief. They maintained that Plan C violates the one person, one vote principle embodied in the Equal Protection Clause of the Fourteenth Amendment, in that it would unconstitutionally dilute the votes of those residents served by the Shelby County School District, leaving them "with little or no chance to control their own school board." A group of small town mayors from the area served by the Shelby County School District and the Shelby County Board of Education intervened, asserting essentially the same constitutional objections to Plan C as the plaintiffs. Relying primarily upon our decision in *Duncan*, the district court concluded that Plan C was unconstitutional, and enjoined its implementation. This appeal followed. We review the district court's findings of fact for clear error, and its conclusions of law de novo.

## II.

In *Duncan*, voters in a rural county school district challenged the election provisions of the EIA, asserting that the county-wide election of local school boards, as applied in Coffee County, violated the Fourteenth Amendment and the one person, one vote principle. Coffee County is divided into three separate school districts. The first two districts include the residents of the cities of Tullahoma and Manchester. The third district consists of those people who live in the remaining areas of the county outside the two cities ("Rural Coffee County"). *Duncan*, 69 F.3d at 90. Under an election plan adopted in response to the EIA, the Coffee County Commission reapportioned its school board. Of the seven available seats, two were completely within the City of Tullaho-

ma; two were mixed between the City of Tullahoma and Rural Coffee County; one was totally within Manchester; one was mixed between Manchester and Rural Coffee County; and one was solely within Rural Coffee County. *Id.* at 91. The residents of Rural Coffee County claimed that this arrangement unconstitutionally diluted their votes in Rural Coffee County School District elections.

 After noting that neither the United States Supreme Court nor this court had ever directly addressed the issue presented in *Duncan*, we noted there that the Supreme Court's extensive voting rights precedents nevertheless set forth a number of basic principles to guide our analysis. *Id.* at 92. "First, 'the conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.'" *Id.* (quoting *Gray v. Sanders*, 372 U.S. 368, 381, 83 S.Ct. 801, 809, 9 L.Ed.2d 821 (1963)). Moreover, an outright ban on the franchise is not the only manner in which a citizen's right to vote may be infringed upon. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964)). Finally, we noted that where a citizen can demonstrate that he lives in the relevant political jurisdiction, there is a strong presumption that he is entitled to vote in its elections. Exclusion of such a citizen from the franchise is subject to strict scrutiny, and will only be upheld upon a showing of a compelling state interest. *Id.* at 93 (citing *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969)).

Relying upon this latter principle, Coffee County contended that it was required to

---

3. The Board of County Commissioners, which adopted Plan C in accordance with its understanding of state law mandates, nevertheless had doubts regarding the validity of Plan C under the federal Constitution. Accordingly, the Board adopted an alternative plan ("Plan A") to be implemented in the event that Plan C was ruled unconstitutional. Under Plan A, the seven single member districts would cover only that area of Shelby County that is outside the city limits of Memphis, and only residents of that area would vote in the school board elections.

include residents of Tullahoma in the elections at issue, because the "relevant geopolitical entity" for purposes of the one person, one vote analysis was all of Coffee County and because neither the county nor the state had a compelling state interest in excluding them. We held, however, that the relevant geopolitical entity for purposes of the one person, one vote analysis is the school district, not the entire county. *Id.* at 93 (citing *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972) ("a citizen has a constitutionally protected right to participate on an equal basis with other citizens *in the jurisdiction*")). Thus, since Tullahoma residents did not reside within the relevant geopolitical entity, their inclusion in the electorate was not mandatory. "The Supreme Court has clearly stated that '[n]o decision of this court has extended the "one man, one vote" principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions.'" *Id.* at 94 (quoting *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68, 99 S.Ct. 383, 389, 58 L.Ed.2d 292 (1978)).

■ Although the inclusion of Tullahoma residents in the electorate for the rural district's school board was not constitutionally required, we went on to note that this does not mean that the state and county could not, as a matter of policy, choose to include them. *Id.* They may do so, so long as the votes of those who do reside within the relevant geopolitical entity are not unconstitutionally diluted. *Id.* We held that

> the benchmark for determining whether the inclusion of "out-of district" voters in another district's elections unconstitutionally dilutes those votes is whether the decision is irrational. A decision to include "out-of-district" voters in the election is not irrational if . . . those voters have a substantial interest in the . . . election.

*Id.* The factors to be considered in determining whether the out-of-district voters meet this substantial interest test include: (1) the degree to which one district is financing the other; (2) the voting strength of the out-of-district voters; (3) the number of, or poten-

tial for, crossover students; and (4) the existence of any joint programs. *Id.* at 96.

In applying these factors, we first noted that Tullahoma residents provided significant financial support to the Rural Coffee County School District. The facts showed that Tullahoma contributed $378,940 and $644,279, respectively, from the property and local option sales tax it collected to the Rural Coffee County School District. *Id.* at 91, 96. The total contribution of over one million dollars accounted for 7.28% of the rural district's total budget, and 21% of all local funds spent there. *Id.* at 96–97. We concluded that

> where, as here, a city provides a substantial amount of its own sales and property taxes to a neighboring school district, and where those funds make up a sizeable portion of the recipient's budget, the decision to make the city residents eligible to vote in the county school board elections is supported by a substantial interest and is therefore not wholly irrational.

*Id.* at 97.

We turned next to the voting strength of the out-of-district residents. Even if the out-of-district residents have a substantial interest in district elections, "[w]here the government allocates the franchise in such a manner that residents of a separate area have little or no chance to control their own school board, there may be grave constitutional concerns." *Id.* We concluded, however, that given the apportionment of seats on the Coffee County School Board, there was only the slimmest possibility that Tullahoma residents will ever control the school board, and that they could do so only if the Rural Coffee County residents acquiesced in such control. *Id.*

With regard to crossover students, we concluded that the number of Tullahoma residents enrolled in the rural school district was minimal. Although Tennessee law created at least the potential for more crossovers, we concluded that this factor was not a strong point for either side. *Id.* Finally, we concluded that the lack of any joint programs between the city and rural school districts favored the position of the rural district voters. *Id.* Taking all of these factors into account, particularly Tullahoma's significant

financial support of the rural schools and the minimal chance that city residents will ever control the rural school board, we held that the county-wide election of local school boards was not unconstitutional as applied in Coffee County.

### III.

In applying the *Duncan* factors to this case, the district court found that the City of Memphis did not provide significant financial support to the Shelby County School District; that the overwhelming voting power of the out-of-district Memphis residents virtually guaranteed that out-of-district residents would control the Shelby County Board of Education; that the number of actual crossover students was minimal, and the potential for additional crossovers was severely limited by a longstanding desegregation order; and that there were, at most, a few relatively minor joint programs between the districts. Accordingly, the district court concluded that the county-wide election of local school board members under Plan C was unconstitutional as applied in Shelby County and enjoined its implementation.

■ On appeal, defendants initially contend that because the Tennessee Constitution requires that local school board members be elected county wide, the district court erred in not deferring to state law in defining the relevant geopolitical entity. However, state constitutions must give way to the require-

ments of the Supremacy Clause when there is a conflict with the federal Constitution. *Reynolds v. Sims*, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964); U.S. Const. Art. VI cl. 2 ("This Constitution ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding"). Accordingly, the district court properly followed *Duncan*, which holds that the relevant geopolitical entity for purposes of the one person, one vote analysis in cases such as this is the school district, not the entire county. *Duncan*, 69 F.3d at 93.[4] Likewise, *Duncan* clearly repudiates defendants' suggestion that the inclusion of Memphis residents in the electorate for Shelby County Board of Education members is constitutionally required. *Id.* at 93–94.

■ Defendants also challenge the district court's application of the *Duncan* factors to this case, asserting that Memphis residents do in fact have a substantial interest in Shelby County Board of Education elections. In *Duncan*, we determined the financial interest of Tullahoma residents based upon the amount of property and sales tax revenues they generated and then allocated to the rural school district. These figures revealed a net flow of over one million dollars from the city to the rural area. Here, the same analysis reveals that Memphis residents do not finance the Shelby County School Dis-

4. Defendants and amici curiae also argue that *Duncan* is not controlling in this case since it did not involve the issue of the dilution of minority votes, and assert that this case does present such an issue. In *Duncan*, we noted that the case before us involved no claim of minority vote dilution. *Duncan*, 69 F.3d at 95 n. 4. This footnote provides no basis for distinguishing *Duncan* from the instant case, however, since this case likewise involves no minority vote dilution. As *Duncan* makes clear, city voters have no constitutional right to participate in the elections of outlying areas since they do not live in the relevant geopolitical entity. *Id.* at 93–94. The issue in *Duncan* was whether it was nevertheless constitutionally permissible to include them, and we noted that there was no problem of minority vote dilution in doing so in that case since there were more blacks in the out-of-district area than in the school district. Thus, minority votes were not diluted—the number of minority votes in the electorate actually increased.

The potential problem alluded to in this footnote is the issue of whether the decision to expand the electorate to include out-of-district voters dilutes minority votes. Such a case would be presented, for example, if a city's electorate was expanded to include white suburban or rural areas in order to prevent a black majority in an urban area from controlling their own local government. However, this case is different. As *Holt* and *Duncan* make clear, the one person, one vote rule has never been extended beyond the borders of the relevant geopolitical entity. As such, dilution concerns are simply not implicated in a decision *not to expand* the electorate. Put another way, black voters in Memphis cannot suffer from dilution of their votes based upon a refusal to include them in the Shelby County Board of Education elections, since they have no constitutional right to vote in these elections in the first place—they have no vote to dilute.

trict, and that the small towns are, in fact, making a net transfer into Memphis.

In counties that have more than one school system, such as Shelby County, Tennessee law requires that county property taxes collected for the support and maintenance of schools be divided between the school districts pursuant to a formula based upon school population. In fiscal year 1994–95, the total amount of school property taxes collected in all of Shelby County was $125,215,344. Of that amount, Memphis residents contributed $81,828,227. Memphis schools, however, received $88,687,780 in property tax revenues under the allocation formula. Conversely, residents of the area served by the Shelby County School District contributed $43,387,117 in school property taxes, yet their schools were allocated only $36,527,564. Thus, of the school property taxes paid by residents of the areas outside of Memphis, $6,859,553 went toward the support of Memphis City Schools.

Disbursement of sales tax revenues for school purposes is likewise based upon the school population formula. The portion of the local option sales tax collected in Memphis in 1994–95 and allocated to schools was $76,847,701. Of that amount, Memphis City Schools received only $73,549,674. Conversely, the amount of sales taxes collected in the areas outside of Memphis and allocated to schools was $27,036,020, but the Shelby County School District received $30,334,047 in sales tax revenues. Thus, of the school sales taxes paid in Memphis, $3,298,027 went toward the support of the Shelby County School District.

The net result of these calculations is that taxpayers in the areas outside of Memphis contributed approximately $3.5 million to the support of Memphis schools during fiscal year 1994–95. Figures for fiscal year 1993–94 show a similar result. Thus, unlike *Duncan*, where city residents demonstrated a substantial interest in the rural school district by virtue of a net transfer of funds from the city to the rural schools, here the transfer of funds is in the opposite direction. Accordingly, the district court was correct in determining that Memphis voters do not have a financial interest that warrants their inclusion in the Shelby County Board of Education electorate under the first *Duncan* factor.[5]

The second *Duncan* factor—voting strength of the non-resident voters—also clearly favors plaintiffs in this case. As noted, under Plan C, Memphis residents constitute a majority in six of the seven school board districts. These majorities are overwhelming, ranging from 63% to 100%, virtually guaranteeing that out-of-district residents will exercise control of the board. Defendants contend that this arrangement presents no constitutional dilemma since, under another section of the EIA, Memphis residents would be ineligible to serve as members on the board. *See* Tenn.Code Ann. § 49–2–201(c). However, the one person, one vote analysis does not focus upon the place of residence of officeholders. Rather, the focus of the analysis is on the "dilution of the weight of a citizen's vote." *Duncan*, 69 F.3d at 92 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964)). Plan C would unconstitutionally dilute the votes of residents of the Shelby County School District by placing the overwhelming majority of ballots in the hands of out-of-district voters.

---

5. Other financial data considered by this court in *Duncan* also clearly supports this conclusion. The *Duncan* court also found persuasive the fact that of the rural district's property tax expenditures, fully 14.5% came from transfers from the city. As noted, there is no such transfer here— no portion of the Shelby County School District's property tax expenditures came from transfers from Memphis. The *Duncan* court also noted that the net transfer of property and sales tax revenues from the city to the rural area accounted for over 7% of the entire budget of the rural school district, and 21% of its local revenues. Here, again, there is no such net transfer from the city, so no portion of the Shelby County School District's total budget or local revenues are attributable to Memphis. Finally, it should be noted that defendants offered evidence that in fiscal year 1992–93, there was a net transfer of $310,826 from Memphis into the Shelby County schools. The district court noted, however, that this is an insignificant amount standing alone, and particularly so in light of the much larger net transfers in the other direction in more recent years.

The third *Duncan* factor—the number of, or potential for, crossover students—likewise favors plaintiffs. The number of actual Memphis residents who attend Shelby County schools is minimal, accounting for less than one percent of county students. Moreover, the majority of these students are only deemed crossover students because Memphis recently annexed the small town in which they reside. As a result, the students continue to attend the same county school as they have attended in the past, but they are now Memphis residents. However, within seven years the Shelby County School District will turn over full ownership and operation of that particular school to the Memphis City Schools, thus eliminating these "crossover" students.

Most of the remaining crossover students attend Shelby County schools under a rule which allows teachers who began working for the school system prior to 1981 to send their children to Shelby County schools regardless of where they reside. Only 106 students, or 0.23% of all county students, attended county schools under this rule during the 1995–96 school year. The number of this type of crossovers will also inevitably dry up over time, as the number of eligible teachers diminishes. Also, as the district court pointed out, the potential for crossovers from any other sources is severely restricted by a desegregation order.

The final *Duncan* factor is the existence of any joint programs. The parties stipulate that the two school districts have agreed that the county will build and operate a school in the area recently annexed by Memphis; that the new school will serve residents of both areas; and that its operation and ownership will eventually be transferred to the Memphis City Schools. Beyond that, defendants can point only to a number of volunteer or extracurricular activities engaged in by residents of both districts, such as the "Homework Hotline" and the "Science Fair." It is, however, doubtful that these are the type of "joint programs" contemplated in *Duncan*. In any event, any support this factor might lend to defendants' position is clearly outweighed by the other factors, particularly the lack of any financial interest in the Shelby County schools on the part of Memphis residents, and the likelihood of overwhelming non-resident control of the Shelby County Board of Education if Memphis residents were to be included in the electorate.

### IV.

Because the district court properly concluded that the Constitution prevents the State of Tennessee from including Memphis voters in the electorate for the Shelby County Board of Education under the circumstances of this case, the judgment of the district court is **affirmed.**